1 | ROGER G. WORTHINGTON, ESQ. CA Bar No. 202147
2 | LAW OFFICE OF ROGER G. WORTHINGTON, P.C.
 | 273 W. 7th Street
3 | San Pedro, California 90731
4 | Telephone: (310) 221-8090
 | Facsimile: (310) 221-8095
5 | rworthington@rgwpc.com
6
 | KAY GUNDERSON REEVES, ESQ. TX Bar No. 08620470
7 | 6815 Lakeshore Dr.
8 | Dallas, TX 75214
 | Telephone: (214) 824-7871
9 | Facsimile: (214) 824-8677
10 | kaygreeves@yahoo.com
11 | Attorneys for Petitioner
12
13 | IN THE UNITED STATES DISTRICT COURT FOR THE
14 | CENTRAL DISTRICT OF CALIFORNIA
15 | EASTERN DIVISION

CV 08 - 06330 PA (CW)

17 | FLOYD LANDIS,

CASE NO:

18 |                      Petitioner,
19 |          and

MOTION TO VACATE ARBITRATION AWARD

20 | UNITED STATES ANTI-DOPING

DEMAND FOR JURY TRIAL

21 | AGENCY

Trial Date:     Not yet assigned
Action Filed:

23 | Respondent.

Date: 11-3-08

Time: 1:30 PM

Crtrm. 15

28

Motion to Vacate Arbitration Award

1        Because the arbitrators considering Floyd Landis's anti-doping appeal failed

2    to disclose business dealings and relationships creating a powerful incentive to rule

3    in favor of his opponent, the U.S. Anti-Doping Agency, Mr. Landis was denied a

4    fundamentally fair arbitral hearing in front of a panel of impartial arbitrators.

5    What he received instead was a fundamentally *unfair* hearing in which the

6    statements of USADA's counsel were given evidentiary weight while record

7    evidence was ignored, and a hearing in which both the law and the evidence were

8    disregarded.     This Court should exercise the authority granted by the Federal

9    Arbitration Act, 9 U.S.C. A. §§10 and 12, and vacate the award issued in the

10    arbitral proceeding known as *Floyd Landis v/USADA*, CAS 2007/A/1394.[1]

11

12    I.    PROCEDURAL ISSUES

13        A.    **Jurisdiction and Venue**

14        Mr. Landis moves to vacate the arbitral award issued by the Court of

15    Arbitration for Sport ("CAS"), the body to which Mr. Landis appealed an adverse

16    arbitration decision issued by a U.S. panel pursuant to the protocol of the United

17    States Anti-Doping Agency.    *USADA v. Floyd Landis*, Case No. AAA 30 190

18    00847 06 ("the Appealed Case").    Thus, this motion to vacate arises under the

_____

[1]    The CAS Panel's decision is attached to this Motion as Exhibit 1.    The

Motion to Vacate Arbitration Decision    -1-

1    Federal Arbitration Act, 9 U.S.C. §10, §12.

2         There is complete diversity of citizenship between the parties, and the

3    amount in controversy exceeds $75,000, so this Court has jurisdiction pursuant to

4    28 U.S.C. §1332(a).

5         Because Mr. Landis moves to vacate the arbitration award based not only

6    upon the statutory grounds articulated in the Federal Arbitration Act but also upon

7    federal common law rules, a federal question is presented, and jurisdiction is proper

8    under 28 U.S.C. §1331.

9         In the alternative, and out of an abundance of caution, Mr. Landis alleges that

10   this motion arises under the United Nations Convention on the Recognition and

11   Enforcement of Foreign Arbitral Awards ("New York Convention"), 9 U.S.C.

12   §§201-208, presenting a federal question that vests this Court with jurisdiction

13   under 28 U.S.C. §1331.

14        Venue is proper in the Central District of California under 9 U.S.C.A. §§9-11

15   and 28 U.S.C. §1391.   The claims described herein arise out of a relationship

16   between the parties that was initiated in this district and performed in substantial

17   part in this district over a period of years.   The contract binding Mr. Landis to

18   arbitration with the Defendant was executed by him in this district,   performance

transcript of the hearing is attached as Exhibit 2.

Motion to Vacate Arbitration Decision      -2-

1    performance of a substantial portion of his obligations occurred in this district, and

2    Defendant supervises U.S. athletes including Mr. Landis in this district on an

3    ongoing and continuous basis.   Enforcement of the $100,000 penalty awarded by

4    the arbitrators in Defendant's favor will occur in this district.   The Defendant,

5    through its agents, does business in this district, and its activities are continuous and

6    substantial.   Alternatively, venue is proper in this district under 9 U.S.C.§ 204.


8         B.    **Parties**

9         Petitioner FLOYD LANDIS , an elite road cyclist pronounced the winner of

10   the 2006 Tour de France, is an individual citizen of Riverside County, California.

11        The UNITED STATES ANTI-DOPING AGENCY, INC. ("USADA") is a

12   not-for-profit corporation with its principal place of business in Colorado Springs,

13   Colorado.   In the United States, USADA is responsible for the management of

14   anti-doping testing and adjudication of enforcement actions arising under the World

15   Anti-Doping Code.

16        C.    **Procedural History**

17        On July 23, 2006, Floyd Landis placed first in the Tour de France and was

18   pronounced its winner, marking the eighth year in a row that an American rider had

19   won road cycling's most prestigious stage race.

Motion to Vacate Arbitration Decision      -3-

1    During the course of the race, Mr. Landis gave multiple urine samples as part

2    of the race's anti-doping program, samples that were tested by the Laboratorie

3    National de Depistage et du Dopage ("LNDD").[2]   Two days after the Tour ended,

4    the LNDD notified his international cycling federation, Union Cycliste

5    Internationale ("UCI") that the ratio of testosterone to epitestosterone [the "T/E

6    ratio"] in the "A" sample he provided after Stage 17 of the Tour exceeded the

7    permissible limits set by the World Anti-Doping Agency ("WADA"), a result the

8    LNDD allegedly confirmed by performing a Carbon Isotope Ratio ("CIR" test).[3]

9    Upon Mr. Landis's request, LNDD performed T/E ratio and CIR tests on the "B"

10   portion of his sample on August 3-5, 2006, reporting that these results confirmed

11   the "A" on August 5. Based on the results of both the T/E ratio and the CIR tests,

12   the LNDD reported an "Adverse Analytical Finding" under the WADA Code, a

13   finding that was subject to enforcement in the United States by USADA.

14        Under the applicable UCI rules, adjudication of Mr. Landis's alleged doping

15   violation was to occur in the United States.   Ex.   3, AAA Panel Decision at ¶5-6.

16   Though UCI rules charged his national federation, USA Cycling, with

17   responsibility for conducting that proceeding, USA Cycling had contractually

---

[2]   Each sample given is divided into an "A" portion and a "B" portion.

[3]   Also commonly referred to as an "IRMS" test.

1   delegated its enforcement responsibilities to USADA, which commenced an

2   anti-doping proceeding against Mr. Landis in September, 2006.   In May, 2007, an

3   original arbitration hearing was held before a panel of the North American Court of

4   Arbitration for Sport of the American Arbitration Association ("the AAA Panel"), a

5   proceeding governed by the USADA protocol and California procedural law.

6       The AAA Panel issued its decision on September 20, 2007, concluding that

7   the T/E ratio test results did not support the doping violation because the LNDD

8   had failed to perform that test (and some aspects of the CIR test) in compliance

9   with the International Standard for Laboratories ("ISL").     However, a 2-1

10  majority of the Panel voted to sustain the doping violation, concluding that LNDD's

11  failure to perform certain aspects of the CIR test in compliance with the ISL had not

12  caused an incorrect result.   The AAA Panel suspended Mr. Landis for a two-year

13  period running from January 30, 2007 through January 29, 2009, imposing

14  tremendous financial hardships on a man who had never made a living from any

15  activity other than cycling.   Ex.   3, AAA Panel Decision at ¶320(1), (6).

17      Mr. Landis appealed this decision to the appellate division of the Court of

18  Arbitration for Sport ("CAS") on October 8, 2007.   Pursuant to CAS rules, he

19  made his arbitrator selection in November, 2007, choosing Mr. Jan Paulsson.

Motion to Vacate Arbitration Decision      -5-

1  USADA selected New York lawyer, Mr. David Rivkin and, upon information and

2  belief, the president of CAS's Appellate Division selected the panel president, Mr.

3  David Williams, after consulting with Mssrs. Paulsson and Rivkin.   Ex. 4. , CAS

4  Rule R54.   The panel selection process was completed by mid-November, 2007.

5       The Panel conducted a *de novo* appeal hearing from March 19-24, 2008 in

6  New York City in March, 2008, pursuant to USADA Protocol, ¶10( c) and CAS

7  Rule R57.   Ex. 4 and Ex.   5, USADA Protocol.     Both   parties to the appeal

8  were domiciled in the United States, the AAA decision appealed from was decided

9  under the procedural rules of the state of California, and on appeal,   U.S.

10  substantive law was applicable since neither the parties nor the CAS panel made a

11  different choice in the manner provided by CAS rules.     Ex. 4,   CAS Rule R58.

12  During the appeal proceeding, CAS applied USADA and UCI protocols as well as

13  its own appellate procedural rules.

14       On June 30, 2008, the CAS Panel not only dismissed Mr. Landis's appeal, it

15  imposed $100,000 in USADA's litigation costs against him, even though UCI rules

16  do not provide for such an award, no evidence had been introduced to support such

17  an award, and the issue of costs was not among the list of issues submitted to the

18  Panel for decision.   That award will be enforced in the United States; indeed, both

19  USA Cycling and USADA have already informed Mr. Landis that they will not

1    issue him a USA Cycling license until he pays the penalty in full.  Ex. 5, Letter to

2    Floyd Landis from William Bock III, September 19, 2008.      The $100,000 award

3    has effectively extended his two-year suspension indefinitely, until such time as Mr.

4    Landis–who has never made his living apart from cycling–is able to come up with

5    the money.

6        Mr. Landis petitions this Court to invoke the authority granted to it under

7    the Federal Arbitration Act, 9 U.S.C. §10 and §12, and vacate the CAS panel's

8    appellate award.      In the alternative and out of an abundance of caution, Mr.

9    Landis petitions this Court to invoke the authority granted to it under the New York

10   Convention, 9 U.S.C. §§201-208, and vacate the CAS panel's appellate award.


12       D.    **Grounds for Motion to Vacate the CAS Panel's Award**

13       21.    The CAS panel award should be vacated because Mr. Landis was

14   denied a fundamentally fair hearing for the following reasons:

15

16           a)    the CAS arbitrator selection process institutionalizes a "repeat player"

17                 bias into the CAS appeal system, creating an unconscionable system in

18                 which athletes are denied a chance at an impartial panel [9 U.S.C.

19                 §10(a)(2); New York Convention, Art. V, §1(a) and (d), Art. V, §2(b)];

-7-

1    §2(b)];

2

3

4    b)    the CAS arbitrators exhibited evident partiality by failing to disclose

5          dealings creating a reasonable impression of possible bias and

6          partiality, and by acting with actual bias [9 U.S.C. §10(a)(2); New

7          York Convention, Art. V, §1(a) and (d), Art. V, §2(b)];

8

9    c)    the arbitrators based their $100,000 cost award on unsworn statements

10         made by USADA's lawyer after the close of the evidence, denying Mr.

11         Landis a right to respond.   In addition, the cost award was outside the

12         scope of the arbitrators' power because the issue of costs had not been

13         formally submitted for decison, and because such an award is not

14         contemplated by the rules governing the proceeding. The cost award

15         was made in manifest disregard of the law, and was unconscionable; [9

16         U.S.C. §10(a)(3), §10(a)(4); New York Convention, Art. V, §1(a), (b)

17         ( c), §2(a) and(b)];

18

19   d)    the procedures and time limits adopted by the CAS panel during the

-8-

1          appellate proceeding prohibited Mr. Landis from presenting his case [9

2          U.S.C. §10(a)(3); New York Convention, Art. V, §1(b)];

3

4      e)    the arbitrators failed to base their substantive decisions upon the

5          evidence presented, but instead relied upon non-evidentiary statements

6          made by counsel for USADA (and fellow CAS arbitrator), Mr. Richard

7          Young [9 U.S.C. §10(a)(3), (4); New York Convention, Art. V, §1(b),

8          §2(b)];

9

10     f)    the arbitrators repeatedly refused to consider Mr. Landis's evidence,

11         tantamount to a refusal to hear pertinent evidence at all [9 U.S.C.A.

12         §10(a)(3); New York Convention, Art. V, §1(b)];

13

14     g)    the arbitrators acted in manifest disregard of the law and their own

15         rules;

16

17     h)    The arbitration procedures as applied in Mr. Landis's case were

18         unconscionable.

19   **II.**   **ARGUMENT**

1

**A.      The CAS appeal process denied Mr. Landis a fundamentally fair**
**hearing decided by impartial arbitrators**

4

**1.      The CAS arbitrator selection process is heavily biased in**
**favor of the doping enforcement bodies, who nominate a**
**majority of the arbitral pool, and who are in a far better**
**position to know which arbitrators are likely to share their**
**interests.**

Only those cyclists holding a cycling license from their national federation are eligible to compete in elite international road cycling events like the Tour de France, and as a condition of being granted a license, each cyclist agrees to the jurisdiction of the Court of Arbitration for Sport.   Ex. 6, Floyd Landis's Cycling License; Ex. 7, UCI Anti-Doping Rules at Parts I, VII, IX, X, XI; Ex. 3, AAA Panel Decision at ¶4, ¶¶10-11.    The form and terms of the cycling license, including the consent to the Court of Arbitration for Sport's jurisdiction are not subject to negotiation; if the athlete wishes to compete, he must consent to the license terms. As required by UCI rules and the USADA Protocol, Mr. Landis's submitted his initial arbitration to a panel of the North American Court of Arbitration for Sport; it

1    Arbitration for Sport; it is the appeal of that process that is the subject of this

2    motion to vacate.

3         At first glance, the CAS appellate procedure presents the appearance of

4    balance.   Each party selects one arbitrator, with the panel president selected by the

5    president of CAS's Appellate Division.   Ex. 4, CAS Rules 48, 53-54.   However,

6    the CAS arbitral pool is heavily dominated by lawyers selected by the organizations

7    charged with enforcing anti-doping regulations.   Though CAS's parent

8    organization, the International Council of Arbitration for Sport (ICAS) formally

9    selects the CAS arbitral pool, it chooses three-fifths of the pool members from lists

10   submitted by the International Olympic Committee (IOC), the national Olympic

11   committees in each member country, and international sports federations like UCI.

12   Ex. 4, CAS Rule S14.   These are the entities that enforce anti-doping regulations

13   against athletes.   While ICAS selects one-fifth of the CAS arbitration pool "after

14   appropriate consultation with a view to safeguarding the interests of the athletes,"

15   organizations representing athletes are not provided an opportunity to submit lists

16   of candidates for appointment to the CAS arbitrator pool.   Arbitrators in the pool

17   serve renewable four-year terms.

18        The IOC, the sports federations, and the national Olympic committees clearly

19   have the ability to stack the CAS pool with arbitrators representing their interests,

-11-

1   interests, while athletes and athlete organizations have no formal ability to

2   influence the composition of the arbitral pool.    Conversely, any arbitrator

3   nominated by one of these bodies has a reciprocal interest in advancing their agenda,

4   thereby increasing the chances of renomination at the end of the four-year term.

5   As if this advantage were not significant enough, it is heightened by the fact that

6   these nominating bodies–and the entities like USADA that share their interests--are

7   in a position to *know* which arbitrators they proposed for inclusion in the CAS pool

8   (and to share that information with other anti-doping enforcement bodies like

9   USADA).    In contrast to an individual athlete, each organization charged with

10  prosecuting anti-doping offenses certainly knows the identities of any lawyers it

11  nominates, and is in a position to gain access to the names of proposed arbitrators

12  submitted by the other federations or sports organizations because they all have an

13  interest in sharing this information amongst themselves, and with like-minded

14  enforcement agencies such as USADA .    By process of elimination, then, they can

15  identify those nominated by ICAS to reflect the athletes' interests.    The athlete, by

16  contrast,    is in no position to known how any particular arbitrator gained

17  admission to the pool, and in no position to make an informed choice.    No

18  organization representing athletes nominates arbitrators, nor are the IOC, sports

19  federations or national Olympic committees likely to share their knowledge about

-12-

1    the CAS pool members with athletes charged with doping violations.    The athlete

2    alone is totally in the dark about the manner in which any particular arbitrator is

3    selected for inclusion into the CAS pool.

4         The sports federations and agencies not only dominate the pool selection

5    process and have a significant knowledge advantage over the athlete, but they also

6    gain an advantage because they appear before the CAS on a regular basis, in

7    contrast to individual athletes.   By virtue of their regular enforcement activities,

8    "repeat players" like USADA are frequently in the position of selecting the

9    individual arbitrators who serve on particular appeal panels, while individual

10   athletes are unlikely to find themselves in this position. Any arbitrator interested in

11   being selected to serve on a regular basis has an incentive to curry favor with those

12   "repeat players" by taking positions favorable to them.    This repeat player bias is

13   well-recognized.   *Acorn v. Intern., Inc.*, 211 F.Supp.2d 1160, 1169-70 (N.D. Cal.

14   2002)(advantages to repeat participants in the arbitration market are well-known);

15   Ex. 8, Letter from Laurence Schultz, President, Public Investors Arbitration Bar

16   Association to Nancy Morris, Secretary, Securities and Exhange Commission, April

17   16, 2008 (describing repeat player bias).

18        Any protection an athlete might gain from his right to select a single

19   arbitrator is undermined not only by the heavily-slanted pool selection process, but

-13-

1   also by CAS Rule R59, which allows the president of a CAS appellate panel to

2   decide the case *alone,* in the absence of a majority.   Ex. 4, CAS Rule R59.

3   Appellate panel presidents, including the Landis panel president,   are chosen by

4   the President of the CAS Appellate Division, a position currently held by Mr.

5   Thomas Bach, who also serves as Vice-President of the IOC.   Ex.4, CAS Rule

6   R53.   Thus, in the unlikely event that an athlete is lucky enough to select an

7   arbitrator included in the CAS pool to "safeguard....the interests of athletes," that

8   arbitrator can be overruled completely by a panel president selected by the

9   Vice-President of the IOC.      That is a particularly troubling prospect in Mr.

10  Landis's case, because comments Mr. Bach made to the media the day his "B"

11  sample results were made public confirmed that Mr. Bach had prejudged his case.

12  Ex. 9-A, "Reacktionen auf den Fall Landis," comments of Thomas Bach, IOC

13  Vice-President, Samstag, August 5, 2006, http: //www.n-tv.de/696797.html

14  (Commenting that the fact that Landis could be suspended immediately furthered

15  the goals of the International Olympic Committee, of which he is Vice-President);

16  Ex.9-B, Declaration of Seth Davidson.

17         Upon closer examination, the CAS system provides only illusory protections

18  to athletes, whose participation in the system is guaranteed by the adhesion

19  contracts they sign as a condition of eligibility.   Ex. 6, Landis USA Cycling

-14-

1    License.    Athletes have no influence on the constitution of the pool, no influence

2    on the decision to renew a pool member's appointment, no access to information

3    about how any particular arbitrator came to be a member of the pool, and, because

4    they appear infrequently before CAS panels, cannot take advantage of the "repeat

5    player" bias favoring anti-doping agencies like USADA.    The system created is

6    entirely one-sided, and institutionalizes bias in favor of the "repeat players;" as such,

7    the system is both procedurally and substantively unconscionable, justifying

8    vacatur.

9          **2.    The CAS arbitrators' failure to disclose dealings with one**

10               **another constituted "evident partiality, exacerbating the**

11               **"repeat player" bias created by CAS arbitrator-selection**

12               **process**

13

14        The inequities created by the CAS's slanted arbitrator selection process are

15    compounded immeasurably by the fact **that CAS allows the members of its**

16    **arbitral pool to continue representing clients before other CAS panels.**

17    Any CAS arbitrator who also represents sports bodies charged with enforcing the

18    anti-doping rules clearly has a bias in favor of his own client's position, and is

19    therefore unlikely to take a position as arbitrator that is adverse to those interests.

-15-

1    So if a client like the IOC frequently finds itself relying upon the lab work done in

2    WADA laboratories to prove up the anti-doping violations it pursues, it is unlikely

3    that an arbitrator representing the IOC would take positions undermining the basic

4    competence of those laboratories when serving as an arbitrator. Such arbitrators do

5    not come to their panels with an open mind, but with an economic interest in the

6    view held by their paying clients.      To make matters infinitely worse, because

7    CAS allows its arbitrators to continue actively representing clients before CAS

8    panels, the arbitrators and party representatives in any given case can expect to find

9    their roles completely reversed in the next, with the former litigant sitting in

10   judgment of a client represented by the former decision-makers.   This is hardly a

11   recipe for impartial decisionmaking.

12        And an impartial decision is what Mr. Landis had a right to receive.   The

13   federal policy favoring arbitration applies not to any arbitration, but to an impartial

14   arbitration, a policy goal the Federal Arbitration Act implements by granting

15   federal courts the authority to vacate arbitration awards in which arbitrators act with

16   "evident partiality."     9 U.S.C.A. §10(a)(2);      *Commonwealth Coatings Corp. v.*

17   *Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337 (1968).   That policy also

18   finds expression in the New York Convention, which permits a court to vacate an

19   arbitral award where the award would be contrary to established public policy,

-16-

1    policy, where the composition of the arbitral panel is inconsistent with the law of

2    the country where the arbitration took place, or where the award is invalid under the

3    rules of the host country.    New York Convention, Art. V§§(1)(a), (1)(d) and (2)(b).

4    The policy is also embraced by the rules of the CAS itself, which require that

5    arbitrators sign a declaration promising "to exercise their functions personally with

6    total objectivity and independence," and to "immediately disclose any

7    circumstances likely to affect his independence with respect to any of the parties."

8    Ex.4, CAS Rules S5, S18 and R33.    In this circuit, evident partiality within the

9    meaning of FAA §10(a)(2) exists both were an arbitrator acts with actual bias, but

10   also where the arbitrator fails to disclose financial, business or other facts that

11   would have created a reasonable impression of partiality.    *Schmitz v. Zilveti*, 20

12   F.3d 1043, 1046 (9th Cir. 1994); *Woods v. Saturn Distribution Corp.*, 78 F.3d

13   424,427 (9th Cir. 1996).    Far from guaranteeing an impartial panel, however, the

14   CAS system exacerbates the existing "repeat player" bias present in any arbitral

15   context by allowing their arbitrators to continue representing clients before CAS

16   panels, creating even more incentives to favor the "repeat players" than would exist

17   in the normal arbitral context.

18        As stated above, arbitrators participating in an arbitral arena featuring "repeat

19   players" already have an incentive to favor the parties that make frequent

-17-

1    appearances before the CAS because these parties determine far more frequently

2    than any particular athlete which arbitrators from the pool are selected and which

3    are not.      However, because CAS arbitrators are allowed to represent clients

4    before the CAS, "repeat players" like USADA present not just the source of future

5    *arbitral* work, but also the source of potential future *legal* business.    Adopting

6    positions favorable to the interests of these "repeat players" is not only more likely

7    to ensure that an arbitrator will obtain future arbitral appointments, but it increases

8    his or her chances of being retained as future legal counsel.    And of course, once a

9    CAS arbitrator embraces positions consistent with those adopted by "repeat

10   players" like USADA, that creates a powerful *reciprocal* incentive for those "repeat

11   players" to do just what USADA did in Mr. Landis's case--hire a practicing CAS

12   arbitrators to represent them.    Not surprisingly, a cursory review of a

13   recently-published listing of CAS cases, parties and arbitrators, confirms that many

14   of the most frequently-selected arbitrators *are* those that continue to represent

15   private clients before CAS panels.    Ex. 10, CAS Case List, 1985-2003 (See

16   arbitrator/lawyers Beloff, Fortier, Martens, Young, Netzle, Morand and Paulsson).

17   Powerful financial incentives clearly exist to align the financial interests of the

18   "judges" with those of the "repeat player" litigants.

19         The fact that these "repeat players" can and do hire CAS arbitrators to

-18-

1    represent them in CAS proceedings introduces a third powerful bias into the system.

2    In a proceeding like the Landis appeal, in which USADA is represented by a lawyer

3    (Mr. Richard Young) who is also a CAS arbitrator (see Ex. 10 and 11), the sitting

4    panelists have a clear incentive to favor USADA because in a future proceeding, the

5    fate of the arbitrator's own client may well be in the hands of the lawyer

6    representing the party in the current proceeding.    The fear of retribution in a future

7    proceeding creates a powerful incentive to decide cases in favor of parties

8    represented by fellow CAS arbitrators.    And because "repeat players" provide far

9    greater potential for long-term legal representation, these parties are far more likely

10   to be able to entice a CAS arbitrator to work for them, creating a virtually closed

11   system in which the athlete cannot compete.

12        Athletes are in a poor position to discover any of these facts.    The process

13   by which arbitrators are selected in the first place is not public, nor are CAS

14   proceedings generally open to the public.    The decisions of CAS panels are

15   publicized only infrequently, posted on the CAS website for temporary periods and

16   then removed.    While official CAS digests are eventually published in book form,

17   those digests lag many years behind the decisions themselves, and contain only a

18   part of the opinion issued by the panel.    Worse, they do not disclose the names of

19   the lawyers representing the parties in those proceedings.    Therefore, athletes like

-19-

1    like Mr. Landis are not able to access the facts that would reveal how the various

2    arbitrators decide cases, which ones might espouse positions more favorable to

3    athletes, or which ones wear two hats, sometimes representing a party, sometimes

4    sitting in judgment as a CAS arbitrator.

5          That situation changed significantly a few weeks ago, when CAS began

6    publishing a relatively comprehensive list of decisions on its website.   Ex. 10,

7    CAS Case List.     The partial listing contains an identification of the litigants

8    (though the names of some athletes are not disclosed), the names of the lawyers

9    sitting as arbitrators, and the names of the lawyer repesenting parties.   At present,

10   this list is partially complete, current only up through 2003.

11         Publication of this list allowed Mr. Landis to discover facts previously

12   unknown to him, facts confirming that the strong potential for "repeat player" bias

13   existed in his case.   The information contained in that list, when combined with

14   the few publicly-available facts and CAS decisions posted on the Internet, revealed

15   that two of the three arbitrators on his panel had represented clients before the CAS,

16   and that the firms of all three arbitrators actively sought out sports bodies as clients.

17   It also confirmed that USADA's lawyer, Richard Young, was himself a CAS

18   arbitrator who had frequently served on panels judging cases in which Mr. Paulsson

19   (the arbitrator selected by Mr. Landis) had represented the IOC.

1    Starkly illustrating that the system for selecting the members of the CAS

2    arbitral pool places athletes at a distinct knowledge disadvantage, the

3    newly-released information indicates that it was Mr. Paulsson–the arbitrator that Mr.

4    Landis selected–who was most active in representing a client (the IOC) responsible

5    for enforcing anti-doping rules, a client likely to take positions completely adverse

6    to those Mr. Landis was taking.    Not counting the Landis case, Mr. Paulsson has

7    participated in CAS proceedings involving at least 34 athletes (or their

8    doctors/managers),[4] but in at least twelve of those proceedings, he appeared on

9    behalf of the IOC.[5]    The CAS Case List indicates that Mr. Paulsson represented

10   the IOC before a panel that included Mr. Young in the case of at least six athletes.[6]

11   In addition, Mr. Paulsson appeared before panels including Mr. Rivkin on at least

---

[4]    *See* Ex. 10, CAS Case List (identifying 29 cases in which Mr. Paulsson appeared as either arbitrator or party representative); Ex. 12, CAS Case Law (*Landaluze v. Real Federacion Espanola de Ciclismo*, CAS 2006/A/1119; 2007/A/1286; *Johannes Eder v. IOC*; 2007/A/1288, *Martin Tauber v/IOC*; 2007/A/1289, *Jurgen Pinter* v/IOC (decided January 4, 2008)).

[5]    Ex. 12, CAS Case Law CAS 2007/A/1286; *Johannes Eder v. IOC*; 2007/A/1288, *Martin Tauber v/IOC*; 2007/A/1289, *Jurgen Pinter* v/IOC (decided January 4, 2008); Ex. 10: CAS 2002/A/389-393 (M. Mayer, W. Mayer, A. Walcher, P. Baumgartl, V. Muller); CAS 2002/O/373 (Scott); CAS 2002/A/370; CAS 2002/A/374; CAS 2002/A/376..

[6]    Ex. 10, CAS 2002/A/389-393 (M. Mayer, W. Mayer, A. Walcher, P. Baumgartl, V. Muller); CAS 2002/O/373 (Scott).

-21-

1    Rivkin on at least four occasions.[7] It also confirms that Mr. Paulsson   presided as

2    an arbitrator in two proceedings where the IOC appeared before him as a party.[8]

3           Nor is Mr. Paulsson the only lawyer in his firm who as a CAS arbitrator, or

4    that represents sports law clients.   His partner, Christian Duve, is a current

5    member of the CAS arbitral pool (Ex. 13, excerpt, CAS arbitrator list), while

6    another partner, Mr. Raj Parker, is a former CAS arbitrator who also regularly

7    represents the Football Association.[9]   Moreover, their firm–Freshfields,

8    Bruckhaus, Derringer–was also one of the lead firms representing the City of

9    London in its successful bid for the 2012 Olympics, a decision made by the IOC.

10   Ex. 15.   Thus, members of the Freshfields firm, particularly Mr. Paulsson, have a

11   significant economic incentive to espouse positions favorable to the IOC, and little

12   interest in embracing positions taken by an athlete with adverse interests.   While

13   the brief biographical statement provided on the CAS website (and written in

---

[7]   Ex. 12, CAS 2007/A/1286; *Johannes Eder v. IOC*; 2007/A/1288, *Martin Tauber v/IOC*; 2007/A/1289, *Jurgen Pinter* v/IOC (decided January 4, 2008); Ex. 10, 2002/A/376 (Baxter).

[8]   Ex. 10, CAS 2000H OG-00-001; 2000H-OG-00-003.

[9]   Ex. 12, CAS Case Law (CAS 2005/A/876, *Adrian Mutu v. Chelsea Football Club* (December 15, 2005)(Mr. Parker appointed as arbitrator); Ex. 14, http://soccernet.espn.go.com/archive/england/news/2002/0529/20020529wfcspallfe at.html; https://www.onlinebld.com/uploads/Black%20Letter%20Law/Copy%20of%20BLL _2007_Final_Printversion/BLL_SECTION5_Judges.pdf.

1    in French) discloses that Mr. Paulsson has represented a number of Formula One

2    drivers, it does not disclose that he frequently represents the IOC before the CAS.

3    Ex. 16, Jan Paulsson Biographical sketch.   When he selected Mr. Paulsson, Mr.

4    Landis had no way of knowing about Mr. Paulsson's significant incentive to reject

5    the sorts of legal arguments he intended to make on appeal.     While proper

6    disclosure would have allowed Mr. Landis to make an informed decision, Mr.

7    Paulsson never disclosed any of these dealings.

8         The recently-published CAS listing also confirms that the Landis panel

9    president, Mr. David Williams, has represented a client before the CAS.   Ex. 10,

10   CAS Case List, CAS 1991/A/56 (representing athlete).     Although he has made no

11   recent appearances on behalf of a litigant, Mr. Williams's London firm, Essex

12   Court Chambers, advertises that it represents "sports governing bodies and

13   individual sportsmen and women as well as acting in litigation or arbitration."

14   Ex.17.    Because Essex Court Chambers seeks to represent sports governing

15   bodies, it must anticipate appearing before the CAS on behalf of these entities.

16        There is no information confirming that Mr. Rivkin has represented a client

17   before the CAS, but the newly-published list contains no information about the last

18   five years, a period in which Mr. Rivkin began representing the international sailing

19   club Club Nautico Espanol De Vela.    Because sailing is an Olympic sport, the

-23-

1    the members of Club Nautico are subject to the World Anti-Doping Code and as

2    such, Mr. Rivkin could reasonably expect to represent the club in CAS proceedings.

3    *Golden Gate Yacht Club v. Societe Nautique de Geneve*, 18 Misc. 3d 1111(A), 856

4    N.Y.S.2d 24 (Table)(N.Y. 2007)(noting that David Rivkin of Debevoise &

5    Plimpton represents Club Nautico Espanol de Vela). Additionally,

6    recently-published information reveals that when Mr. Paulsson and Mr. Rivkin

7    were selected to serve on the Landis panel, Mr. Rivkin was serving as president of a

8    CAS panel considering the IOC's enforcement action against three Austrian

9    cross-country skiiers, proceedings in which Mr. Paulsson represented   the IOC.

10   Thus, Mr. Rivkin–the USADA arbitrator–was sitting in judgment of Mr.

11   Paulsson–the Landis arbitrator–while the Landis appeal was pending.   Ex. 12,

12   CAS Case Law,   2007/A/1286, *Johannes Eder v. IOC*; 2007/A/1288, *Martin*

13   *Tauber v/IOC*; 2007/A/1289, *Jurgen Pinter* v/IOC (decided January 4, 2008).

14        The CAS Case List also reveals the many occasions on which Mr. Young

15   (USADA's lawyer), has served on CAS arbitration panels before which Mr.

16   Paulsson appeared for the IOC.   The list confirms that during 1994-2003, Mr.

17   Young served as a CAS arbitrator eleven times,[10] and in six of these proceedings,

---

[10] CAS 2002/A/370; CAS 2002/A/374; CAS 2002/A/373.; CAS 2000H
OG-00-15; CAS 2000H OG-00-012; CAS 2000H OG-00-006; CAS 1998/A/184;
CAS 1998 H OG-98-002.

1    Mr. Paulsson appeared before him representing the IOC.[11]    This confirms that

2    Mr. Young sat in judgment of Mr. Paulsson's client on more than half of the

3    occasions in which he was appointed as a CAS arbitrator, while Mr. Paulsson

4    appeared before Mr. Young more than half of the times that he appeared before

5    CAS representing the IOC.[12]

6         Mr. Landis had no way of knowing all of the above-recited facts when he

7    selected Mr. Paulsson to serve as arbitrator on his CAS appeal panel in November,

8    2007.    Mr. Landis also did not know that in November, 2007, Mr. Paulsson was

9    actively representing the IOC in three high-stakes cases pending before a CAS

10   panel to which Mr. Rivkin (the USADA-selected arbitrator) had been appointed

11   president.    Ex. 12, CAS Case Law, 2007/A/1286, *Johannes Eder v. IOC*;

12   2007/A/1288, *Martin Tauber v/IOC*; 2007/A/1289, *Jurgen Pinter* v/IOC (decided

13   January 4, 2008).    Upon information and belief, the stakes were particularly high

14   for Mr. Paulsson and his client in these cases because they were the first in which

15   the IOC had disqualified athletes for anti-doping violations in the absence of a

16   positive test, and the first cases in which the IOC sought a life-time ban.

17        Although no available evidence indicates that Mr. Paulsson or Mr. Rivkin

---

[11] CAS 2002/A/370; CAS 2002/A/374; CAS 2002/A/373.

[12]    See Notes 5-6.

1   acted improperly, a clear appearance of bias exists.      CAS Rule R59 gave Mr.

2   Rivkin the sole power to decide the fate of Mr. Paulsson's client, so persuading Mr.

3   Rivkin was clearly crucial to Mr. Paulsson's success in these   cases.    The

4   appointment of both Mr. Paulsson and Mr. Rivkin to the Landis appeal panel

5   presented a timely opportunity for Mr. Paulsson to discuss the facts of his

6   high-profile IOC cases with Mr. Rivkin.    It also created an unfortunate incentive to

7   trade votes, with Mr. Paulsson agreeing to exchange a vote on the Landis appeal for

8   favorable treatment from Mr. Rivkin in the cases of the three Austrians.

9         Again, Mr. Landis does not allege that such conduct actually occurred.

10   Rather, he alleges that Mr. Paulsson should have disclosed that he had three

11   important cases pending before Mr. Rivkin at the time both were named to the

12   Landis panel so that Mr. Landis could have made an informed decision about

13   whether he wanted to run the *risk* of improper conduct.    The complete lack of

14   disclosure deprived Mr. Landis of any opportunity to make an informed decision,

15   and gave rise to a reasonable impression of possible bias, which is "evident

16   partiality" under the FAA.

17         Further compounding the institutional conflicts of interest created in the CAS

18   system, the fact that Mssrs. Rivkin, Williams, and Paulsson also serve in other

19   arbitral pools together creates additional opportunities for financial biases to arise,

1    arise, biases that could undermine impartiality.    As they do in the CAS system, Mr.

2    Rivkin, Mr. Paulsson and Mr. Williams participate in these international arbitral

3    proceedings, appearing    as either lawyer or arbitrator, again sitting in judgment of

4    one another's clients in arbitration proceedings.    To give but one such example, in

5    2006-7, Mr. Rivkin represented Occidental Petroleum Corporation and Occidental

6    Exploration and Production Company in an arbitration proceeding where the stakes

7    exceeded $1 billion, a proceeding in which Mr. Williams served as arbitrator.    Ex.

8    18.    Thus, these arbitrators constantly find themselves changing hats, arbitrator

9    one day, litigant the next.    The only party routinely excluded from this cycle is the

10   athlete, who is not provided access to information revealing this web of

11   professional relationships.    These business dealings should have been disclosed

12   but were not.


14        These problems are not unique to the Landis appeal.    The

15   recently-published CAS case listing confirms that many of the most

16   frequently-appointed CAS arbitrators represent clients before the Court, or have

17   colleagues that do,    including Dirk-Reiner Martens, Michael Beloff, Stephen

18   Netzle, Yves Fortier, and Jean-Pierre Morand.    In fact, the frequency with which

19   Mssrs. Young, Martens, Fortier, Beloff, Netzle and Morand were appointed to CAS

-27-

1    CAS panels was so high that each time Mr. Paulsson represented the IOC before a

2    CAS panel, he appeared before one of those lawyer/arbitrators.     In the case

3    involving skiier, Alain Baxter, every lawyer and arbitrator in the case save one

4    served as both a lawyer and CAS arbitrator; Mr. Rivkin and Mr. Paulsson both

5    participated in this case.    Ex. 12, CAS Case Law, CAS 2002/A/376, *Baxter v/IOC*.

6    The CAS Case List illustrates a revolving door system, in which the judges are

7    constantly changing places with the advocate.    That being the case, each member

8    of the Landis appeal panel–but especially Mr. Paulsson-- could reasonably expect

9    that in the event they or a member of their firm appeared before CAS on behalf of a

10   client, USADA's lawyer, Mr. Young, might well be sitting on their panel.     This

11   created an additional and powerful incentive to take positions favorable to Mr.

12   Young's client, USADA.

13        The clear conflict of interest created by allowing CAS arbitrators to represent

14   clients remains largely invisible to athletes like Mr. Landis due to the CAS's failure

15   to routinely publicize its decisions, or to make public the identities of the arbitrators

16   and lawyers involved in each case.    However, the conflicts created by allowing

17   arbitrators to represent clients before the CAS or AAA are well-known to the CAS

18   itself.    In 2006, athlete Tim Montgomery discovered that the law partner of an

19   arbitrator appointed to his panel (Yves Fortier) represented the World Anti-Doping

-28-

1    the World Anti-Doping Agency; he asked CAS to annul the award issued by the

2    panel including Fortier, a request reported to have been dismissed by the CAS "out

3    of hand."   Ex. 20 .   Further, in 2007, the director and general counsel of the

4    Canadian Centre for Ethics in Sport submitted comments to WADA requesting that

5    Articles 8 and 13.2 of the World Anti-Doping Code be amended to prohibit CAS

6    arbitrators from representing clients before the Court due to the conflict of interest

7    created.   Ex. 21-A , Letter from Joseph De Pencier to World Anti-Doping

8    Agency, March 30, 2007 at 4; Ex. 21-B, Feedback on [WADA] Code 2007, Version

9    2.01, Art. 13-02, October 1, 2007, at 3 of 3 (comments of Joseph DePencier).

10   This requested revision was never implemented.

11        While CAS is well aware of the problem created by this built-in conflict of

12   interest, Mr. Landis was not.   That is why arbitrators are under a duty to discover

13   and disclose relationships like these, relationships that create a powerful incentive

14   to disapprove of positions hostile to the interests of "repeat player" clients like the

15   IOC and USADA.   The "repeat players" that hire CAS arbitrators like Mr.

16   Paulsson as lawyers depend upon the WADA labs' work as   proof of anti-doping

17   violations when they represent clients before the CAS; as such, they and their

18   lawyers have a strong incentive to defend the scientific rigor of the tests used by

19   these labs, and the competence of the lab's staff.   An objective observer would

-29-

1    be hard-pressed to conclude that an arbitrator who also represents a "repeat player"

2    like the IOC--or one that sought out such clients--could be impartial when faced

3    with an appeal like that brought by    Mr. Landis, which attacked the competence of

4    a WADA lab, attacked the scientific reliability of the lab tests, and challenged the

5    Code interpretations that presumed that the work of WADA labs was performed

6    properly and in a scientifically reliable manner.

7         No disclosure was made in Mr. Landis's case.    Each CAS arbitrator failed to

8    disclose ongoing dealings that created an actual and clearly identifiable incentive to

9    rule in favor of USADA and its counsel, Mr. Rich Young, dealings creating a

10   reasonable impression of partiality or possible bias.    Mr. Paulsson, Mr. Rivkin and

11   Mr. Williams should have disclosed that they represented parties before the CAS

12   and/or affirmatively solicited business to provide such representation, parties with

13   interests adverse to those of athletes seeking to prove their innocence.    Mr.

14   Paulsson and Mr. Rivkin should have disclosed that Mr. Rivkin was sitting in

15   judgment of Mr. Paulsson and his client, the IOC, in three pending cases at the very

16   time that both were selected to sit on the Landis panel.    And Mr. Paulsson should

17   have disclosed his ongoing representation of the IOC, as well as the fact that he had

18   repeatedly appeared before Mr. Young and Mr. Rivkin, and could expect to do so in

19   the future.

-30-

1    Each of these arbitrators had a duty to investigate and disclose these facts.

2    *Schmitz*, 20 F.3d at 1048.    The failure to disclose at least the facts described above

3    created a reasonable impression of potential bias, constituting "evident partiality"

4    under the FAA. 9 U.S.C. §10(a)(2); New York Convention, Art. V., §§1(a) and (d),

5    §2(b).    It also prevented Mr. Landis from making an informed decision about

6    whether to object to the composition of the panel.   Because arbitrators are not

7    isolated from each other, but instead hear and decide cases as a panel, after joint

8    discussion, debate and deliberation, each panel member has an opportunity to

9    persuade the others.   *Wheeler v. St. Joseph Hospital*, 63 Cal. App. 3d 345, 133 Cal.

10    Rptr. 775, 793 (Cal. App. 1976).    Thus, a finding of evident partiality on the

11    part of one arbitrator warrants vacatur of an entire arbitration award.    *Schmitz*,

12    20 F.3d at 1049.

13    Where, as here, the party challenging an award demonstrates that an

14    arbitrator failed to disclose business dealings that would have created a reasonable

15    impression of potential bias had they been known, it is not necessary to demonstrate

16    that any member of the panel acted with actual bias by producing specific facts

17    indicating an improper motive.    *Woods v. Saturn Distrib. Corp.*, 78 F.3d 424, 427

18    (9th Cir. 1996); *Premo v. Martin*, 119 F.3d 764, 771 (9th Cir. 1997).   However, the

19    record facts in this case do provide a basis for concluding that the Panel deferred to

1  Panel deferred to fellow CAS arbitrator, Mr. Young, acts that could be attributable

2  to the presence of actual bias.   Specifically, the panel treated Mr. Young's

3  statements as evidence on at least three occasions, deference afforded no other

4  lawyer in the case.

5      First, as described below in greater detail [*see* pages 39-43], the panel

6  accepted Mr. Young's statements as evidence in support of its decision to impose

7  $100,000 in "costs" against Mr. Landis.   At the time the evidentiary hearing

8  closed, there was no record evidence on the amount or reasonableness of any of

9  USADA's litigation expenses, nor was the issue of costs submitted to the Panel for

10  decision.   Ex. 1, CAS Decision at 19.   However, USADA's post-hearing brief

11  contained Mr. Young's unsworn statements describing the extent and

12  reasonableness of some of USADA's costs, statements the Panel relied upon in

13  assessing the $100,000 penalty against Mr. Landis.

14      Second, as again argued in detail below [*see* pages 50-66]   the panel

15  accepted Mr. Young's unsupported statement to resolve a key issue relating to

16  LNDD's accreditation.   On appeal, Mr. Landis challenged LNDD's accreditation

17  to perform the CIR method, arguing that the accreditation documents put in

18  evidence by USADA confirmed that LNDD was only accredited to conduct the CIR

19  test with a 20% measurement of uncertainty, not the 0.8‰   uncertainty

-32-

1    measurement it actually used, and that had the 20% measurement of uncertainty

2    been used, his results could not have been declared    positive.    Apparently

3    concerned that Mr. Landis was correct about the LNDD's accreditation status, the

4    Panel sidestepped the issue by relying on a statement made by Mr. Young in a

5    footnote to his post-submission brief, a statement making the unsupported (and

6    incorrect) assertion that had the 20% measurement of uncertainty been applied, Mr.

7    Landis's sample results would still have been positive.    Ex. 1, CAS Decision at

8    ¶48, Ex. 22, Appellee's Post-Submission Brief, at 8, footnote 7.

9         Finally, as also argued in detail below [*see* pages 76-84], the panel accepted

10   Mr. Young's "common sense" explanation to reconcile important inconsistencies

11   between a document USADA relied heavily upon–a gas chromatography column

12   maintenance log (Exhibit T142)--and the sworn testimony of USADA's own

13   witness, the LNDD technician who was supposed to have actually made the entries

14   on Exhibit T142.

15        Because arbitrators have a free rein to decide the law as well as the facts, and

16   because their decisions are accorded a high degree of deference, the impartiality of

17   those arbitrators must be scrupulously safeguarded.    *Commonwealth Coatings*

18   *Corp. v. Continental Casualty Co.*, 393 U.S. 145, 149, 89 S.Ct. 337, 339, 21

19   L.Ed.2d 301 (1968).    In this case, no safeguards existed.    The stacked arbitral

-33-

1   pool and the institutional bias favoring repeat players like USADA prejudiced Mr.

2   Landis from the outset.    This prejudice was compounded by the CAS's willingness

3   to allow its arbitrators to continue representing clients before CAS panels, and by

4   the Landis panel arbitrators' failure to make any disclosures, leaving   Mr. Landis

5   with no opportunity to make an informed decision.    As the above-described facts

6   illustrate, the CAS system is an insider's club, favoring repeat players at the

7   expense of athletes, a disadvantage that is only exacerbated when the arbitrators on

8   a particular panel continue to represent clients before the CAS or seek to do so.

9   Because the arbitrators on Mr. Landis's panel failed to disclose business dealings

10  and interests creating a reasonable impression of potential bias, vacatur is proper

11  under FAA, 9 U.S.C.A. §10(a)(2) and the New York Convention, Art. V(1)(a), (d),

12  Art. V (2)(b).

13      **B.    The Panel's decision to impose a $100,000 penalty on Mr. Landis**

14          **must be vacated because the decision was outside the scope of the**

15          **arbitrators' power, was unsupported by any evidence, and was not**

16          **permitted by clearly applicable law.**

17      Perhaps the strongest evidence that the Panel's decision-making was based

18  upon actual bias was its decision ordering Mr. Landis, who has been unable to

19  practice his profession since July, 2006, to pay $100,000 to USADA as

-34-

1   reimbursement for its litigation costs.   The decision was made even though neither

2   party had formally submitted the issue of costs to the Panel for decision and neither

3   party had introduced evidence as to the amount or reasonableness of costs to the

4   Panel.   Instead, the Panel relied solely upon a request for costs made by fellow

5   CAS arbitrator (and USADA's lawyer), Richard Young in a post-hearing

6   submission to which Mr. Landis had no right of reply.   Imposing such an onerous

7   burden upon Mr. Landis–a burden that effectively extends his two-year sentence

8   indefinitely–without hearing evidence or providing a right of reply denied Mr.

9   Landis the basic due process right to a fundamentally fair hearing, and to a decision

10   based on the evidence, in clear violation of well-established public policy.

11   Further, the Panel erred in deciding an issue not submitted to it by the parties, and

12   in manifestly disregarding clearly applicable UCI rules directly on point.   As such,

13   vacatur of the panel's cost decision is proper under FAA, §10(a)(2), (3), and (4),

14   and with the New York Convention, Art. V (1)(a), (b), ( c), and §2(b), and because

15   it is an unconscionable decision made in manifest disregard of the law.

16

17          1.     **The Panel's $100,000 cost award should be vacated because**

18                 **the issue of costs was not among the issues submitted to the**

19                 **Panel for decision.**

-35-

1      Prior to the hearing, the CAS Panel directed both parties to submit a list of

2  issues to be decided, which issues defined the scope of the arbitrators' mandate. Ex.

3  1, CAS Decision at ¶19.      The list of issues defined the matters that were to be

4  litigated in the hearing, as well as the matters to be addressed in closing arguments

5  and in the post-hearing briefing requested by the Panel. Ex. 2, Tr., 1494:15-1498:9.

6  The list of issues also defined the scope of the matters submitted to the arbitrators

7  for a decision within the meaning of 9 U.S.C. §10(a)(4) and the New York

8  Convention, Article V(1)( c).   Neither party submitted the issue of an appropriate

9  award of costs to the   CAS Panel for decision.   Ex. 1, CAS Decision at 3-5,

10  ¶¶19-20.[13]

11      Mr. Landis was entitled to a fundamentally fair hearing, including the right to

12  have notice of the issues being litigated, and about which he would be compelled to

13  put on evidence.   *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 657 (9th Cir. 1964),

14  cert den'd, 380 U.S. 988 (1965). The CAS Panel directed the parties to define the

15  issues being submitted for determination, and directed them to limit their

---

[13]   Although USADA's post-hearing brief contains a footnote implying that
the issue of costs was USADA's "Issue #8" and Appellant's "Issue #11," that is
incorrect.   Ex. 22, Appellee's Post-Hearing Brief at 48, n. 45. The issues submitted
for determination are set forth at pages 3-5 of the CAS Decision, in ¶¶19-20.
USADA did not submit eight issues, it submitted only two (and neither addressed
costs), while Mr. Landis's eleventh issue had nothing to do with costs.   Ex. 1,
CAS Decision , ¶¶19-20.

1    limit their post-hearing briefing to the issues raised in that set of issues.    Mr.

2    Landis was entitled to rely upon the CAS Panel's direction, and confine his proffer

3    and briefing to the issues actually submitted for decision, issues that did not include

4    costs.    Because the Panel decided an issue not submitted for decision, vacatur is

5    proper under 9 U.S.C.A. §10(a)(4) and New York Convention, Art. V, (1)( c).

7         **2.    In assessing $100,000 in USADA's litigation costs against Mr.**

8              **Landis, the CAS Panel manifestly disregarded clearly**

9              **applicable UCI rules, rules that do not permit the award of**

10             **such costs, justifying vacatur**

11         Although the CAS Panel acknowledged that UCI Anti-Doping Rules

12    provided the rules of decision in the Landis appeal, it did not apply them.    Ex. 1,

13    CAS Decision at 6, ¶22; Ex. 4, CAS Rule 58.    Those rules expressly provide that

14    each party shall bear the costs of their own witnesses and experts. Ex. 7, UCI

15    Anti-Doping Rules 241, 244.    Rule 245 defines the only exceptions to this rule; it

16    permits a panel to award the costs of sample testing, results management and the

17    *initial* hearing proceeding (that is, the 2007 AAA hearing), but only if those costs

18    have been actually determined by the hearing panel.    Ex. 7, at Rule 245.    Not

19    only are these exceptions inapplicable here, but none of them permits the Panel to

-37-

1    the award of the opposing party's *litigation* costs when deciding anti-doping cases.

2    Further, since *no* costs were "actually determined" by the Panel, no possible

3    argument could be made that Rule 245 would have permitted the award of costs in

4    Mr. Landis's case.

5         The UCI rules are consistent with CAS Rules 65.1 and 65.2, which provide

6    that panel awards shall be rendered without costs other than a court office fee not in

7    dispute here.   Similarly, CAS Rule 65.3 provides that each party shall advance the

8    costs of its own experts and witnesses.   Ex. 4, CAS Rule 65.3.

9         Despite the fact that the CAS Panel acknowledged that it was bound by the

10   UCI Anti-Doping Rules and its own procedural rules, *see* Ex. 1, CAS Decision at

11   ¶22-27, it declined to follow them, imposing $100,000 in litigation costs.   This

12   decision was made in manifest disregard of clearly applicable rules, justifying

13   vacatur.

14           **3.      Because the CAS Panel's $100,000**

15                **cost award was not based on evidence,**

16                **Mr. Landis was denied a fundamentally**

17                **fair hearing, so vacatur is proper.**

18

19        Not only was the Panel's $100,000 cost award contrary to law and outside

-38-

1    the scope of the issues submitted to it for decision, it was not based upon the

2    evidence, violating Mr. Landis's basic due process right to an arbitration based on

3    evidence.

4         It is indisputable that at the close of the evidentiary portion of the hearing,

5    USADA had presented no documents, no testimony, and no argument detailing the

6    extent and reasonableness of its alleged litigation costs.    When the panel officially

7    closed the record on March 24, 2008, it expressly prohibited the parties from

8    submitting *any* further evidence, and prohibited them from filing any    any

9    additional pleadings with the exception of the post-appeal written submissions.

10    Ex.2,    Tr. 1502:17-23, 1503:23-25.    And as stated above, that post-hearing brief

11    was to be linked directly to the list of issues to be decided–a list that did not include

12    costs. Ex. 2, Tr. 1215:19-1217:24, 1493:1-1499:10.

13         Not to be dissuaded, USADA decided to use the post-hearing brief to

14    present Mr. Young's statements in support of the cost award.    In that brief, Mr.

15    Young alleged (without benefit of supporting bills, invoices or receipts) that

16    USADA had incurred "out-of-pocket" expenses totaling at least $99,000–$60,000

17    in costs for "transportation, hotel, and meals in New York City for nine witnesses

18    whom Appellant demanded be present in person for cross-examination and then

19    elected not to call," and $33,000 in expert witness fees.    Ex. 22, Appellee's

-39-

1    Post-Hearing Brief at 48.    Mr. Young requested that the Panel assess these costs

2    against Mr. Landis as a penalty for his inability to cross-examine all of the French

3    fact witnesses, and for his insistence upon pursuing a full range of issues on his *de*

4    *novo* appeal.    *Id* at 48-9.    Mr. Young's statements were not sworn, verified, or

5    supported by any documentary evidence, nor were they subject to

6    cross-examination, and because the Panel had prohibited the filing of any additional

7    post-hearing brief (like a reply), Mr. Landis had no right of response.

8         Unable to anticipate Mr. Young's argument and prohibited from filing a

9    reply, Mr. Landis had no opportunity to challenge the absence of evidence or the

10   substance of Mr. Young's statements.    He had no opportunity to present the

11   record evidence demonstrating that his failure to call all of the French witnesses

12   was attributable solely to the severe time constraints imposed at the hearing, not to

13   any litigation misconduct [*see* argument at pages 43-49 below].    He had no

14   opportunity to produce evidence about the hardship such a penalty would impose

15   upon him since he had been prevented from making a living in cycling. And he had

16   no opportunity to argue that CAS precedent suggested that even if the facts were as

17   Mr. Young alleged, the "equitable" decision was to let each party bear its *own* costs.

18   Ex. 12, CAS Case Law,   *Landaluze v. Real Federacion Espanola de Ciclismo*,

19   CAS 2006/A/1119 at ¶120 (Paulsson, president)(where Panel concluded that sports

-40-

1    that sports federation had lodged many "futile" arguments, the "equitable" solution

2    was to let each party pay its *own* costs).      Despite these inequities,   the panel

3    assessed $100,000 in costs against Mr. Landis based solely upon the statements

4    made by fellow CAS arbitrator, Mr. Young.

5           When it based its $100,000 cost award upon the unsworn statements of

6    fellow CAS arbitrator, Richard Young, while denying Mr. Landis any right of reply,

7    the CAS Panel violated Mr. Landis's right to a fundamentally fair hearing, in which

8    decisions are based upon evidence, not the statements of counsel, and in which both

9    parties have notice and an equal right to be heard.   *Sunshine Mining Co. v. United*

10   *Steelworkers of America*, 823 F.2d 1289, 1295 (9th Cir.1987); *Townley v. Heckler*,

11   748 F.2d 109 (S.D.N.Y. 1984)(disability claimant's due process rights were

12   violated when the administrative law judge relied upon a post-hearing report as the

13   primary evidence upon which disability benefits were denied).   It denied him the

14   right to present any case in opposition to Mr. Young's cost allegations, a denial of

15   due process justifying vacatur under 9 U.S.C.A. §10(a)(3) and New York

16   Convention, Art. V, §(1)(a) and (b) and §2(b).

17          **4.  SUMMARY**

18          The Panel's award must be vacated because the issue of costs was not

19   among the issues submitted to the Panel for determination.   As such, the Panel

1    exceeded the powers granted to it and violated fundamental notions of due process,

2    which emphasize the importance of notice and an opportunity to respond. Thus, a

3    motion to vacate is proper under 9 U.S.C. §10(a)(3) and (4) and the New York

4    Convention, Art. V, §1( c) and §2(a).

5            The panel's award must be vacated because imposing the litigation costs of

6    the prevailing party upon the loser is contrary to UCI rules and is therefore a

7    decision made in manifest disregard of the law, and in contravention of the FAA, 9

8    U.S.C. §10(a)(3) and (4), and New York Convention, Art. V, §1(a).

9            The panel's award must be vacated because it was a decision made with

10   evident bias in favor of fellow-CAS arbitrator and USADA lawyer, Richard Young,

11   whose unsworn, unsupported and unchallenged statements provided the only basis

12   for the award.   Further, the arbitrators' evident partiality render all of its decisions

13   subject to vacatur, including its cost award.   Vacatur is therefore appropriate under

14   the FAA, §10(a)(1) and (2) and New York Convention, Art. V, §1(a) and §2(b).


16           Finally, the panel's cost award should be vacated because it was not

17   supported by evidence.   The right to have decisions based upon evidence is a

18   fundamental due process right, and a necessary component of a fundamentally fair

19   hearing. *Ficek v. Southern Pacific Co.*, 338 F.2d 655, 657 (9th Cir. 1964), cert den'd,

-42-

1    den'd, 380 U.S. 988 (1965).   As such, the decision is unconscionable, justifying

2    vacatur. Vacatur is similarly justified under FAA, §10(a)(3) and New York

3    Convention, Art. V, §1(a) and (b) and §(1)(b) and §(2)(b).

4         **C.**    **The hearing procedures adopted by the CAS Panel prevented Mr.**

5                **Landis from presenting his case, justifying vacatur**

6         Just as the system for selecting the CAS arbitral pool and appellate panels has

7    an appearance of balance, so the hearing procedures adopted by the Landis panel

8    had the appearance of fairness.   In reality, those procedures placed Mr. Landis,

9    who bore a heavy burden of proof, at a distinct disadvantage because they

10   prevented him from presenting his evidence and cross-examining more than half of

11   USADA's nineteen witnesses.   To add insult to injury, Mr. Landis's inability to

12   fully present his case formed the basis for imposing the $100,000 punitive cost

13   award against him.   Ex. 1, CAS Decision at ¶289.   Because the arbitrators

14   refused to hear all of Mr. Landis's evidence and prevented him from presenting his

15   complete case–a right not denied USADA–he was denied a fundamentally fair

16   hearing, and the CAS award should be vacated.   9 U.S.C. §10(a)(3), (4); New

17   York Convention, Art. V §1(b).

18        While arbitrators may not be bound by the rules of evidence, the FAA, the

19   New York Convention, and   fundamental notions of due process require that each

-43-

1    party to an arbitration be provided an adequate opportunity to present its evidence

2    and arguments.   *Kiewit/Atkinson/Kenny v. International Brotherhood of Electrical*

3    *Workers*, 76 F.Supp.2d 77, 80-1    (D. Mass. 1999)(citing *Hoteles Condado Beach,*

4    *and La Concha Convention Center v. Union de Tronquistas Local* No. 901, 763

5    F.2d 34, 39 (1st Cir. 1985)).    Mr. Landis was denied adequate time to present a

6    highly technical scientific challenge to the LNDD's test results at both the AAA

7    and CAS panel levels.   His ability to present his case was substantially prejudiced

8    by these time constraints, prejudice that was greatly enhanced by the procedures

9    adopted by the CAS panel for the submission of witness testimony.

10        At both the CAS appeal and the AAA hearing, the parties were placed on a

11    "time clock," and both   allocated an equal number of hours in which to present

12    their evidence.   Ex. 23,   CAS Panel Procedural Memorandum, December 13,

13    2007, Part 4, at 3-4; Ex. 24,   Letter from Carmen Martinez Lopez to the Parties,

14    March 17, 2008 at 1 (parties allocated 14 hours).   Because Mr. Landis bore a

15    heavy burden of proof, this equal allocation placed him at a distinct disadvantage.

16        Because CAS appeals proceed *de novo*, the disputed issues were no less

17    complex than those addressed at the AAA hearing.   Further, presentation of both

18    parties' evidence would require time-consuming translation.   Recalling his

19    inability to call all of the relevant fact witnesses to testify at the nine-day AAA

1    hearing,   Mr. Landis asked the CAS panel to give him five days to present his case

2    in chief at the appeal hearing.   This request was rejected.   Instead, the Panel

3    allotted only five days hearing time total, with each party allocated 14 hours in

4    which to present their case.   Ex. 23, CAS Panel Procedural Memorandum,

5    December 13, 2007, Part 4, at 3-4; Ex. 24, Letter from Carmen Martinez Lopez to

6    the Parties, March 17, 2008 at 1 (parties allocated 14 hours).

7         This severe limitation was made more onerous by the Panel's decision to

8    receive direct witness testimony by written submission. Ex. 23,     CAS Panel

9    Procedural Memorandum, December 13, 2007, ¶¶4.7-4.8, at 4-5.   This seemingly

10   innocuous decision had disastrous and extremely prejudicial consequences for Mr.

11   Landis because the Panel imposed no limit on the *number* of witnesses that could

12   submit direct testimony.   Since the submission of written direct testimony did not

13   count against a party's time allocation, the Panel's procedural order created a

14   powerful strategic incentive for USADA to *increase* the number of witnesses it

15   would call, realizing that Mr. Landis would simply run out of time before

16   cross-examining all of them.

17        This is precisely what happened.   Mr. Landis, who bore the burden of proof,

18   presented only five direct witness declarations--one fewer than at the AAA

19   hearing-- while USADA, which had called only nine witnesses at the nine-day

-45-

1    AAA hearing [see Ex. 3, AAA Decision at ¶100], submitted written testimony from

2    *nineteen* witnesses. Ex. 25, USADA Witness Designation, January 31, 2008; Ex. 26,

3    USADA's Motion in Limine to Exclude Evidence in Violation of CAS Rule 56 at

4    4-5 (March 14, 2008)(adding as a witness submission the March 14, 2008 letter

5    from COFRAC administrator, Robin LeGuy).   The inequity was all the more

6    egregious because USADA–unlike Mr. Landis–had access to all of the LNDD fact

7    witnesses, and could discover the facts known to them outside the hearing room,

8    allowing USADA to use its precious hearing time more efficiently.   Denied

9    depositions, Mr. Landis was left to develop the crucial facts about what the LNDD

10   staff actually did when they tested his Stage 17 sample through cross-examination

11   alone.   There is simply no way that Mr. Landis could conduct meaningful

12   cross-examination of nineteen witnesses in fourteen hours of hearing time, and the

13   record clearly reflects this.

14          Despite having been allocated a few more hours hearing time, Mr. Landis

15   was still compelled to waive his brief introductory direct examination [Ex. 2, Tr.

16   43:18-44:2], to abandon at least one issue in its entirety [Ex. 2, Tr. 22:12-17], and

17   to relinquish his right to cross-examine ten of USADA's 19 witnesses [Ex. 2, Tr.

18   793:24-794:23, 805:18-806:14, 807:1-22, 810:15-20, 1218:20-25, 1221:2-11,

19   1396:6-25, 1408:5-20].   He also had to circumscribe both his opening and closing

1    arguments because he ran out of time [Tr.   112:7-9, 128:12-22, 1385:4-13,

2    1424:13-18, 1433:7-1434:12].       His inability to cross-examine witnesses

3    inflicted express prejudicial harm upon him because the CAS panel relied upon the

4    unchallenged testimony to support its conclusions.   Ex. 2, CAS Decision at ¶178

5    (CAS relies on testimony of "uncontroverted" chain of custody witnesses that Mr.

6    Landis "did not elect to examine" to resolve evidence in USADA's favor).

7          Not only was he prejudiced by his inability to cross-examine more than half

8    of USADA's witnesses, he was penalized for that failure. Mr. Landis's inability to

9    cross-examine all of the French lab witnesses was one of the key grounds offered in

10   support of the Panel's decision to award $100,000 in costs:   "The Appellant gave

11   notice requiring a number of witnesses to be present in person for

12   cross-examination in New York *but then elected not to call them* thus causing the

13   Respondent to incur significant and ultimately unnecessary costs."   Ex. 1, CAS

14   Decision at 57, emphasis added.   Mr. Landis did not *elect* not to call these

15   witnesses; he had every incentive to cross-examine them, but simply ran out of time,

16   a fact unequivocally confirmed by the record.     Ex. 2, Tr. 793:24-794:23,

17   805:18-806:14, 807:1-22, 810:15-20, 1218:20-25, 1221:2-11, 1396:6-25,

18   1408:5-20.

19         The appellate procedures adopted by the CAS Panel denied Mr. Landis a

-47-

1    meaningful opportunity to develop the factual record needed to establish the crucial

2    facts about the LNDD's analysis of his Stage 17 samples, and denied him any

3    opportunity to cross-examine more than half of the witnesses testifying against him,

4    a denial of due process. *Willner v. Committee on Character and Fitness*, 373 U.S.

5    96, 103, 83 S.Ct. 1175, 1180, 10   L.Ed.2d 224 (1963).   USADA suffered no

6    comparable harm.   Because Mr. Landis was denied a fundamentally fair hearing,

7    and was prevented from presenting his case, the proceeding was unconscionable, so

8    vacatur is appropriate. Vacatur is also proper under FAA, 9 U.S.C.§10(a)(3) and the

9    New York Convention, Art. V, §1(b) and §2(b).

10        **D.    The CAS Panel's repeated refusal to consider evidence supportive**

11               **of Mr. Landis's substantive arguments was tantamount to a**

12               **refusal to hear evidence at all, justifying vacatur under 9 U.S.C.A.**

13               **§10(a)(3) and New York Convention, Art. V, §1(b).**

14        The Panel's award was the product of a process slanted heavily in favor of

15               the interests of "repeat player" anti-doping enforcement

16               agencies like USADA, a process made even more onerous by

17               procedural rulings made by Mr. Landis's particular panel.

18               Although Mr. Landis contends that this resulted in a number of

19               erroneous decisions in which the Panel either misapplied the law

-48-

1       law or improperly weighed the facts, he is mindful of the scope

2       of review under the FAA.   As such, Mr. Landis challenges five

3       substantive decisions made by the Panel, decisions marred by

4       the Panel's refusal to credit evidence favorable to Mr. Landis's

5       position, even when that evidence was contained in documents

6       proffered by USADA in support of its own case, and even when

7       uncontroverted by other evidence.

8   **1.**     **The Panel ignored USADA's own documentary evidence in**

9       **concluding that LNDD was actually accredited to perform the tests**

10      **it used to analyze Mr. Landis's Stage 17 sample, crediting instead**

11      **late-produced "evidence" from an incompetent witness**

12  Because the AAA Panel concluded in 2007 that the T/E ratio test could not

13  be used to support the reported anti-doping violation, the CAS appeal focused on

14  the sole remaining basis for that violation–the results of LNDD's CIR test.   This

15  test measures the ratio of Carbon[12] atoms to Carbon[13] atoms in the testosterone

16  metabolites contained in a sample to determine if some of the testosterone in a

17  person's body is of an exogenous nature.   The centerpiece of   Mr. Landis's

18  appeal was that LNDD had neither used a reliable CIR method nor performed the

19  method it *did* use correctly, violating the ISL. Ex. 27, Appeal Brief of Floyd Landis,

1     *passim;* Ex. 28, Landis Closing Brief, *passim.*

2        A threshold issue in the analysis was whether the CIR method that LNDD

3     used had ever been accredited by its national accreditation body, COFRAC.   This

4     determination was crucial because the answer to the accreditation question

5     determined how the burden of proof was allocated between the parties, and whether

6     USADA would be permitted to avail itself of certain presumptions in the WADA

7     Anti-Doping Code.

8        Although the anti-doping agency bears an inital burden of proving the

9     anti-doping violation "to the comfortable satisfaction" of the Panel, that burden is

10    satisfied by simply introducing the results of the lab's positive test if the lab is

11    accredited to perform the method it used.   Ex. 29, WADA Code, Art. 3.1, 3.2.   If

12    the lab used an accredited method, USADA is entitled to the benefit of a

13    presumption that the lab performed that method correctly on the occasion in

14    question.   Ex. 29, WADA Code, Art. 3.2; Ex. 1, CAS Decision, ¶¶28-33.

15    However, if the lab did *not* use an accredited method, USADA had to prove that the

16    method conformed to the "scientific community's practices and procedures," and

17    that LNDD "satisfied itself as to the validity of the method before using it." Ex. 29,

18    WADA Code, Art. 3.1., 3.2; Ex.7, UCI Anti-Doping Rules, Art. 18; Ex. 12, CAS

19    Case Law,   *USADA & UCI v. Tyler Hamilton,* CAS 2005/A/884, ¶¶47-54.

1    Evidence of accreditation is clearly required and is part of USADA's burden;

2    otherwise, it could avail itself of the Code's powerful presumptions based upon an

3    unsupported allegation of accreditation in every case. Ex. 29, WADA Code, Art.

4    3.1. Under CAS Rule R56, USADA was obliged to produce the arguments and

5    evidence in support of accreditation or reliability (or both) in its answering brief,

6    filed January 31, 2008.   And under the Panel's own scheduling orders, all witness

7    testimony was to be filed by March 7, 2008. Ex. 30, Letter from Matthieu Reeb to

8    the parties, February 29, 2008.

9    USADA's appeal brief, filed January 31, 2008,   contained a specific

10   accreditation argument discussing the importance to be assigned COFRAC

11   accreditation and the weight to be accorded the work of the COFRAC auditors.

12   Ex. 31, Appellee's Brief at 14-15, 28-29. The brief also contained numerous

13   assertions that the LNDD's CIR method was accredited.   *Id.* at 6, 15, 27-29, 49, 57

14   (assertions that CIR/IRMS method was accredited).   USADA presented several

15   COFRAC accreditation documents to support its allegations, but designated no

16   COFRAC witnesses to buttress that argument. Ex. 31, Appellee's Brief at 90 and

17   Ex. 25, Appellee's Witness List (January 31, 2008).   Contrary to USADA's

18   repeated assertions, however, the COFRAC accreditation documents established on

19   their face that LNDD was *not* accredited to perform the CIR method in the manner

-51-

1        in the manner it used to analyze Mr. Landis's Stage 17 sample.

2            Although it is undisputed that LNDD used a 0.8 ‰   measurement of

3    uncertainty to declare that the CIR values it measured confirmed the presence of

4    exogenous testosterone in Mr. Landis's sample, the COFRAC accreditation

5    documents do not confirm that LNDD was accredited to conduct the CIR method at

6    this level of precision.    Instead, each and every COFRAC document introduced by

7    USADA indicated that at the time Mr. Landis's samples were analyzed, LNDD was

8    only accredited to perform the CIR test with a *20%* measurement of uncertainty, not

9    the 0.8 ‰ the lab used to declare Mr. Landis's sample a positive.[14]   Ex. 32,

10   Excerpt, USADA appeal exhibit T026 at LNDD 0086 (COFRAC's May 2006

11   accreditation document accrediting CIR method at 20% uncertainty level); LNDD

12   414 (LNDD's February 2006 audit, showing a 20% measurement of uncertainty

13   accreditation and extending the September 2005 accreditation, also at 20%); LNDD

14   429 (showing a 20% measurement of uncertainty accreditation); LNDD 456

15   (undated validation study indicating LNDD uses a 0.8‰   measurement of

16   uncertainty); Ex. 31, Appellee's Brief at 26-8 (LNDD uses a   0.8‰

17   measurement of uncertainty and did so when interpreting Mr. Landis's results); Ex.

18   28, Landis Closing Brief at 7-10 .    Not only do these three documents expressly

_____

[14] The CIR method, which is alternatively referred to as an "IRMS" test, is

1    documents expressly state that as of May 2006, LNDD was only accredited to

2    perform the CIR method at a 20% uncertainty level, but it appears that this had been

3    the standard for quite some time; LNDD 414 is simply an updated version of an

4    earlier accreditation document issue in September 2005, which also contained the

5    20% measurement uncertainty figure, as indicated by the date change noted at the

6    bottom of the page.   Ex. 32, Excerpt, USADA appeal exhibit T026 at LNDD 0414.


8    It was not until December 15, 2006--months *after* Mr. Landis's sample was

9    analyzed–that LNDD obtained COFRAC accreditation at the 0.8‰ uncertainty

10    level. Significantly, the document includes an express effective date of December

11    15, 2006, not an earlier date, contradicting any suggestion that the updated

12    accreditation was intended to be retroactive.    Ex. 32, Excerpt, USADA appeal

13    exhibit T026 at LNDD 0097-98 ("Date de prise d'effet: 15/12/2006"/Date of effect:

14    12/15/06).

15       COFRAC may have been reluctant to accredit LNDD at the

16    substantially-more precise    0.8‰    measurement of uncertainty in light of the

17    CIR/IRMS method deficiencies COFRAC noted at the February 2006 audit, and the

18    six-month delay that LNDD requested in order to remedy those deficiencies. Ex. 32,

---

method "EC 31" on LNDD's COFRAC accreditation documents.

1    Ex. 32, Excerpt, USADA appeal exhibit T026 at LNDD 418 (LNDD request   for

2    renewal and extension of accreditation for various methods); LNDD 428 (LNDD

3    requests an extension for certain doping control procedures), LNDD 429 (EC31

4    [CIR test] listed among the processes for which an extension was sought); LNDD

5    414 (COFRAC accreditation document confirming that an extension had been

6    requested for EC31); LNDD 400 (recommending a six-month delay to address

7    IRMS deficiencies).    Whatever the reason, it is indisputable that any potential

8    customer going to the LNDD in seach of CIR testing services between February

9    2006 and December 15, 2006 would have come away with one and only one

10    conclusion–that LNDD was accredited to perform CIR testing at only a 20%

11    measurement of uncertainty level.

12        Not only did USADA's brief fail to present evidence to resolve the crucial

13    deficiency in its own accreditation evidence–a deficiency which had been raised in

14    the AAA hearing almost a year earlier [Ex.33, Excerpt, AAA Transcript at 878-9

15    (testimony of Dr. Christiane Ayotte), Ex. 28, Landis Closing Brief at 9]–but

16    USADA tendered no document and designated no witness (including, particularly,

17    the COFRAC auditor) to rebut the unambiguous statements contained in the

18    COFRAC accreditation documents, not even to rebut Mr. Landis's expert, Dr.

19    Goldberger, who discussed USADA's tender of accreditation documents in his

1   March 7 declaration.   Instead, under the guise of a motion to strike the portions of

2   Dr. Goldberger's testimony discussing the accreditation issue, USADA sought to

3   introduce an unverified letter from COFRAC administrator, Robin LeGuy, a letter

4   attached to its motion to strike. This occurred five days before the CAS appeal

5   commenced on March 19, and well after the deadline for submission of exhibits and

6   witness statements.   Ex. 26, USADA's Motion in Limine to Exclude Evidence in

7   Violation of CAS Rule 56 at 4-5 (March 14, 2008) and attached March 14, 2008

8   letter from Robin LeGuy; Ex. 30; Ex. 4, Rule R56.   In his letter, Mr. LeGuy–who

9   did *not* participate in the February 2006 audit at LNDD–stated that all of the

10  COFRAC documents stating a 20% measurement of uncertainty were mistaken, and

11  that the December 15, 2006 accreditation document should be considered

12  retroactive to May 1, 2006, providing a neat resolution to USADA's accreditation

13  problem.   Exhibit 26, March 14 letter of Robin LeGuy.

14       By proffering Mr. LeGuy's "testimony" in the form of an unsworn letter

15  submitted *after* the deadline for briefing and both direct and rebuttal witness

16  declarations, USADA was able to deny Mr. Landis the opportunity to marshal

17  evidence to counter that letter,   something the CAS Rules are intended to prevent.

18  Ex. 4, CAS Rules R51, R55, R56; Ex. 30, Letter from Matthieu Reeb to Maurice

19  Suh and Richard Young, February 29, 2008 (setting forth hearing scheduling order;

-55-

1   hereinafter "CAS Scheduling Order") .   Despite USADA's failure to present its

2   proof by the deadlines imposed by the Panel's scheduling order, or by the deadlines

3   imposed by Rule R56, the Panel admitted Mr. LeGuy's unsworn letter into evidence,

4   ostensibly in exchange for its decision not to strike the portions of Dr. Goldberger's

5   testimony discussing accreditation. Ex. 2,   Tr. 23:3-15, 31:3-32:4, 40:5-13.   The

6   "exchange" was not a fair one however; Mr. Landis did not need to rely upon Dr.

7   Goldberger's testimony to make his point because USADA's accreditation problem

8   was presented on the face of its own documentary evidence, documents it needed to

9   rely upon to prove that LNDD was accredited at all. Ex. 32, Excerpt, USADA

10   appeal exhibit T026 at LNDD 0086.   USADA, however, absolutely needed a

11   COFRAC witness to "explain" that the three COFRAC accreditation documents

12   executed by the absent COFRAC auditor did not mean what they said–that LNDD

13   was only accredited to perform the CIR method at a 20% measure of uncertainty.

14   The Panel not only admitted the letter, *see* Ex. 2, Tr. 19:7-19, 22:24-23:11, it relied

15   upon it.   Ex. 1, CAS Decision, ¶45-7.

16       The Panel's decision to admit the March 14 LeGuy letter stands in stark

17   contrast to its decision to exclude the portion of Dr. Goldberger's chain of custody

18   testimony discussing LNDD's failure to provide complete documentation of the

19   whereabouts of Mr. Landis's "B" sample on July 20, 2006. Though Mr. Landis had

1   clearly launched a broad attack on LNDD's chain of custody in his appeal brief,

2   [*see* Ex. 27, Brief of Floyd Landis at 69, 73 (LNDD's chain of custody documents

3   "do not suffice to create a proper chain of custody," they "fail to record

4   intra-laboratory transfers," and they fail to "record the location of the bottle during

5   the time it was in the laboratory")], the CAS Panel excluded all of Dr. Goldberger's

6   testimony about breaches occurring on July 20 because such examples were not

7   specifically enumerated in Mr. Landis's appeal brief. Ex. 2, Tr. 45:18-47:13

8   (decision); Tr. 24:15-38:10 (argument); Ex. 34, Landis Response to USADA's

9   Motion in Limine at 6-7; Ex .26, USADA's Motion in Limine to Exclude Evidence

10   in Violation of CAS Rule 56 at 2-3.     As argued above, while it is not necessary

11   for Mr. Landis to prove actual bias to establish that the Panel acted with evident

12   partiality, the fact that the Panel excluded Dr. Goldberger's testimony, which was,

13   at a minimum, timely under the scheduling order, but admitted Mr. LeGuy's, which

14   was not, suggests actual bias in favor of fellow CAS arbitrator, Mr. Young.


16   The Panel relied upon Mr.LeGuy's March 14 letter --"evidence" it

17   considered unchallenged because Mr. Landis "elected" not to cross-examine Mr.

18   LeGuy[15]--in making the crucial determination that LNDD was accredited to perform

---

[15]   Mr. LeGuy was one of the ten witnesses Mr.Landis was unable to

1    perform the CIR method at the 0.8‰ uncertainty level.   CAS Decision, ¶¶45-7.

2    But that letter should not have been considered for the same reasons that Dr.

3    Goldberger's chain of custody evidence was excluded– it was produced well after

4    all relevant deadlines. Ex. 4, CAS Rule R56, Ex. 30, CAS Scheduling Order.   The

5    Panel disregarded its own rules in admitting this letter, a decision suggestive of

6    actual bias because it failed to accord the parties equal treatment under Rule R56.

7         Further, Mr. LeGuy's letter–like the unsupported statements of counsel–was

8    not evidence because he was not a competent witness.   Mr. LeGuy lacked personal

9    knowledge of the facts because he was not one of the COFRAC auditors involved

10   in the February 2006 LNDD audit upon which the later accreditation was based.

11   Ex. 32, Excerpt, USADA appeal exhibit T026 at LNDD 383 (identifying COFRAC

12   audit team members).   Nor does his March 14, 2008 letter offer any other

13   foundational allegations that might explain how he gained personal knowledge of

14   the facts stated in the letter.   Indeed, Mr. LeGuy's lack of familiarity with the

15   facts surrounding the audit is revealed by his statement that COFRAC received "*all*

16   appropriate information for the validation of method EC31 [CIR]."   Ex. 26,

17   LeGuy March 14, 2008 letter, attached to USADA's Motion in Limine to Exclude

18   Evidence in Violation of CAS Rule 56.   This statement is highly improbable,

cross-examine due to time constraints.   Ex. 2, Tr. 1396:6-25.

1    highly improbable, given that the LNDD's own staff testified that the critical "peak

2    matching" component of the CIR test had never been reduced to writing in a

3    Standard Operating Procedure (SOP), meaning that a document describing the

4    method could not have been given to the COFRAC auditor.   Ex. 2, Tr.

5    658:17-660:25, esp. 660:5-25 (testimony of LNDD staff, Cynthia Mongongu).

6    Since he had not personally observed the accreditation activities and alleged no

7    source from which he might have derived personal knowledge, Mr. LeGuy was not

8    competent to testify about the precision with which LNDD was able to perform the

9    CIR test during the COFRAC audit, or whether the actual COFRAC auditor, Bruno

10   LeBizec, made a "mistake" by noting the 20% measurement uncertainty on at least

11   three COFRAC accreditation documents. Mr. LeGuy simply did not know what

12   happened at the COFRAC audit; his knowledge rested not on his own recollections

13   and observations, but on his interpretation of COFRAC's documents.   And no

14   existing COFRAC audit document even hinted that COFRAC intended to accredit

15   LNDD's CIR method at a 0.8‰   measurement of uncertainty prior to December

16   15, 2006.   Ex. 32, Excerpt, USADA appeal exhibit T026 at LNDD 86, LNDD

17   97-98, LNDD 414 and LNDD 429.   Indeed, if such a document existed, it surely

18   would have been included in USADA's evidence, rendering Mr. LeGuy's March 14

19   letter unnecessary.

1    The Panel's decision to admit and rely upon Mr. LeGuy's March 14, 2008

2    "testimony" was made in manifest disregard of CAS Rule R56 and its own

3    scheduling order.   More significantly, however, relying on that letter to contradict

4    COFRAC's own documents was tantamount to deciding the issue in the complete

5    absence of evidence because Mr. LeGuy was not a competent witness.   *U.S. v.*

6    *Beck*, 418 F.3d 1008, 1015 (9th Cir. 2008)(lay witness testimony is rationally-based

7    where it is founded upon personal recollection and observation of concrete facts).

8    While the rules of evidence do not strictly apply in an arbitration context, a

9    fundamentally fair hearing requires that a decision be based upon *evidence*, not

10   unsupported statements by out-of-court "witnesses." *Sunshine Mining Co. v. United*

11   *Steelworkers of America*, 823 F.2d 1289, 1295 (9th Cir.1987); *Ficek*, 338 F.2d at

12   657.    Relying upon COFRAC accreditation documents to find *for* USADA–as it

13   did when deciding that the CIR method was accredited *at all* –but disregarding

14   those clear and unequivocal documents when they supported Mr. Landis is

15   suggestive of actual bias.   Moreover, failure to consider competent documentary

16   evidence in favor of late-produced "evidence" contained in an unsworn,

17   out-of-court statement made by a person lacking personal knowledge is tantamount

18   to a refusal to consider the documentary evidence at all, making vacatur appropriate

19   under 9 U.S.C.A.     §10(a)(2), (3) and New York Convention, Art. V§(1)(b) and

1    Art. V§(1)(b) and §2( b).

2         The Panel compounded this error by relieving USADA of its burden of proof.

3    Apparently concluding that if it was wrong about the accreditation question,

4    WADA Code, Art. 3.2 would operate to shift the burden to USADA to prove that

5    the LNDD's failure to apply the 20% uncertainty did not cause the positive result,

6    the Panel went on to draw just such a conclusion on USADA's behalf:   "even

7    applying a 20% uncertainty, the delta-delta value would still be over 3.0%, and the

8    Appellant's test would still be positive."     Ex. 1 ,CAS Decision, ¶48.   Although

9    USADA should have borne a heavy burden to prove this fact to the "comfortable

10   satisfaction" of the Panel, see Ex. 29, WADA Code at 3.1, 3.2,   the Panel appears

11   to have done USADA's work for it without benefit of evidence, stating its

12   conclusion without a shadow of a reference to the record.   In doing so, the Panel

13   manifestly disregarded the applicable law by relieving USADA of its burden (a

14   burden the panel clearly acknowledged and understood see CAS Decision, ¶¶29-33),

15   and by making a decision not based upon any evidence tendered by any party.

16   Not one of USADA's witnesses offered this testimony, nor did any document

17   include such a statement.

18        It is not surprising that USADA's witnesses wouldn't testify to the

19   conclusion the Panel reached–it is patently incorrect.   The 20% is a *measurement*

-61-

1    uncertainty assigned to bound the uncertainties created by inevitable measurement

2    error.    As such, it is applied to LNDD's *measured* isotopic values–the "delta"

3    value-- not the "delta-delta" value, which is simply a subtraction value the lab

4    derives by subtracting the value it measured for an endogenous reference compound

5    from the value it measured for the testosterone metabolite of interest.[16]      In fact,

---

[16]    Applying the 20% uncertainty to the "delta" value (the difference between LNDD's measured isotopic value and a standard value) as opposed to the "delta-delta" value makes a significant difference, as can be seen by considering an example using the values LNDD derived for Mr. Landis's sample . See Ex. 31, Appellee's Brief, pages 27-8 for a table of both the delta values and the delta-delta values.      The first table on page 27 presents the measured delta values for Mr. Landis's sample, the second table on page 27 presents the measured delta values for the endogenous reference compound, and the first table on page 28 presents the delta-delta values (the difference between the delta for the sample and the delta for the endogenous reference compound).      To take but one example, consider LNDD's delta value of -27.72 for Mr. Landis's "A" sample 5-alpha metabolite (the metabolite that LNDD relied upon to report the positive test).      Applying a ±20% measurement uncertainty to that measurement yields a range of values between -22.18 and -33.26.    The   ±20% measurement uncertainty must also be applied to the -21.58 delta value for the endogenous reference compound, pdiol, yielding a range of values between -17.26 and -25.9 on the "A" sample.      LNDD declares a positive only if the value of the testosterone metabolite is more than 3.8 delta units more negative than the value of the endogenous reference compound to which it is being compared (-3.8).      But if one calculates a delta-delta by selecting a 5-alpha value at the least negative end of the possible range (-22.18) and a pdiol value at the most negative end of the range ( -25.9), the 5-alpha value is clearly *less* negative than the pdiol, not more, yielding a delta-delta of +3.72, a result that could *not* be declared positive under LNDD's positivity criteria, which requires a delta-delta of -3.8.      Similarly, a value of   -24.00 falls within the range of possible values for both the 5-alpha and the pdiol, generating a delta-delta of zero.    Again, not a positive.    The same holds true for the "B" sample.    Applying the    ±20% measurement uncertainty to the measured value for 5-alpha (-27.43) yields a range

-62-

1    In fact, the statement that Mr. Landis's sample would still have been positive

2    even if a 20% uncertainty measurement had been applied is contained in only one

3    place–a footnote to USADA's post-hearing brief written by its lawyer.    Ex. 22,

4    USADA's Post-Hearing Brief at 8, footnote 7.   Though this footnote provides a

5    reference to ¶26 of Dr. Christianne Ayotte's witness declaration, her declaration

6    contains no interpretation or application of the 20% measurement uncertainty.

7    Ex. 35, Witness Declaration of Dr. Christianne Ayotte, March 7, 2008.   Instead,

8    the fuzzy math can be credited to the brief's author,   Richard Young, USADA's

9    lawyer and fellow-CAS arbitrator.   Had Mr. Landis been permitted a right of reply,

10   he could have pointed out that the statement was both unsupported and incorrect,

11   but just as the Panel's limitations on the post-hearing briefs denied him a right to

12   reply to Mr. Young's assertions about litigation costs, it also prohibited him from

---

range of values between -21.63 and -32.92, while applying the same measurement uncertainty to the measured value for the endogenous reference compound, pdiol, yields a range of values between -25.26 and -16.84.    If one again calculates the delta-delta value by selecting a 5-alpha value at the least negative end of the possible range (-21.63) and a pdiol value at the most negative end of the range ( -25.26), one gets a delta-delta value of +3.63, which is not a result that can be declared positive under LNDD's criteria, which requires a delta-delta value more negative than 3.8 (-3.8).    Moreover, the value -24.00 is again within the range of possible values for both the 5-alpha and the pdiol, yielding a delta-delta of zero; again, not a positive result under LNDD's criteria.   Because application of the the ±20% measurement does not yield a delta-delta that is positive across the *entire* range of values in either the "A" or the "B" sample, Mr. Landis's result could not have been declared a positive if the   ±20% measurement uncertainty had been

1   him from presenting any reply to footnote 7.   Ex. 2, Tr. 1502:17-23, 1503:23-25.

2   This is yet another example of the deference that the CAS panel afforded to

3   Mr. Young, suggesting the existence of actual bias.

4        In reaching the conclusion that Mr. Landis's test would still have been

5   positive no matter what measurement uncertainty was applied, the Panel also

6   misapplied the burden of proof in at least two ways, manifestly disregarding the law

7   it acknowledged and correctly articulated at the outset of it decision.   Ex. 1, CAS

8   Decision, ¶¶28-33. First, the Panel imposed upon Mr. Landis the burden of

9   disproving accreditation, a burden he does not bear under the Code.   Having made

10  this mistake, the Panel then concluded that Mr. Landis was obligated to present his

11  proof in his appeal brief, and that his "failure" to do so justified the decision to

12  admit the late-produced letter of Mr. LeGuy.   Ex. 1, CAS Decision at 11,   n. 23.

13  But proving or disproving accreditation was not part of Mr. Landis's burden under

14  the Code, it was USADA's.   Ex. 29, WADA Code, Art. 3.1, 3.2; Ex. 12, CAS

15  Case Law, *Hamilton* at ¶¶47-54. Once USADA made clear that it would rely upon

16  accreditation–as it did in its own appeal brief, filed months after Mr. Landis's

17  –USADA had the burden of establishing the fact of accreditation, which it did on

18  January 31, 2008 by submitting the COFRAC audit documents in its Exhibit T026.

applied.

-64-

1    Ex. 36, USADA's Exhibit List. To deny    Mr. Landis the right to point out that

2    USADA's own evidence contradicted its claims about LNDD's accreditation status

3    would prevent Mr. Landis from presenting a case, making vacatur appropriate

4    under 9 U.S.C.A. §10(a)(3) and New York Convention Art. V(1)(b).[17]

5        Second, the Panel relieved USADA of its burden of proving that Mr.

6    Landis's sample would still have been positive if the    ±20% measurement

7    uncertainty had been applied by doing USADA's work for it, and extracting the

8    unverified, unsupported and incorrect footnote 7 out of Mr. Young's closing brief.

9    If USADA was to make this point, it had to do so with *evidence*, not bare

10    allegations of counsel, submitted at a time when Mr. Landis had no right of reply.

11    The Panel's action relieved USADA of this burden, in manifest disregard of the law.

12

13        The Panel's conclusion about accreditation was not based upon evidence, it

14    was based upon two unsworn statements made by declarants (Mr. Young and Mr.

---

[17]    Moreover, the Panel simply misstates the record–Mr. LeGuy's March 14 letter was admitted "in exchange" for the Panel's decision to let Dr. Goldberger *testify* about the COFRAC accreditation documents, not "in exchange" for allowing Mr. Landis to pursue the argument *at all*.    The issue decided by the Panel when it "admitted" Mr. LeGuy's letter was not whether the accreditation *argument* would be permitted, but whether the Leguy and Goldberger testimony *about* accreditation would be permitted. Ex. 2,    Tr. 23:3-15, 31:3-32:4, 40:5-13; USADA's Motion in Limine at 5.    The documents providing the foundation for the argument itself were in the case either way because USADA needed them to establish that LNDD's CIR

1    LeGuy) who lacked competence to testify.   Relying upon those statements was

2    tantamount to deciding the issue in the complete absence of evidence, denying Mr.

3    Landis a fundamentally fair hearing and justifying vacatur.   9 U.S.C.A. §10(a)(3)

4    and New York Convention, Art. V, §1(b) and   2(b).

5    **2.    The Panel ignored uncontroverted evidence from USADA's own**

6    **witnesses and documents, and disregarded clearly applicable law**

7    **when it concluded that the LNDD's peak identification method**

8    **complied with the ISL, justifying vacatur**

9

10   COFRAC may have been reluctant to accredit the LNDD's CIR method at

11   the 0.8‰   degree of precision because the lab failed to document the method used

12   for a key step in the analysis–identification of the testosterone   metabolite peaks in

13   chromatographic data generated by the CIR instruments.   ·This failure, *conceded*

14   *by the lab*, violated applicable WADA Technical documents and the ISL, which

15   required that such methods be documented.   Ex. 28,   Landis Closing Brief at

16   10-15; Ex. 37, TD2003IDCR; Ex. 28, ISL, §5.4.4.3.1.   As the Panel expressly

17   acknowledged, since Mr. Landis established that the LNDD failed to comply with

18   the ISL, the burden should have shifted to USADA to demonstrate that the violation

---

establish that LNDD's CIR method was accredited at *all*.

1  that the violation did not cause the alleged doping violation, something USADA did

2  not prove in the case below.    Ex. 29, WADA Code, Art. 3.1, 3.2; Ex. 1, CAS

3  Decision at ¶¶28-33. But because the Panel refused to acknowledge the

4  uncontroverted evidence establishing the ISL violation—a decision it was able to

5  reach only by disregarding this uncontroverted evidence—it deprived Mr. Landis of

6  a finding that should have resulted in victory.    Mr. Landis therefore asks this Court

7  to vacate the Panel decision.

8      The CIR (Carbon Isotope Ratio) test is intended to distinguish between

9  naturally produced (endogenous) testosterone and synthetically produced

10  (exogenous) testosterone contained in a urine sample.    All testosterone metabolites

11  are comprised of carbon, oxygen and hydrogen atoms, including the stable isotopes

12  of carbon, Carbon [12] and Carbon [13].    Natural testosterone  metabolites have both

13  Carbon [12] and Carbon [13] atoms, but the ratio between these atoms varies    among

14  individuals, influenced as it is by diet and other factors.    Carbon [12] and Carbon [13]

15  are also present in synthetic testosterone metabolites, but because these products

16  tend to be made from soy, which is Carbon [13]-depleted, a person using synthetic

17  testosterone    products will have comparatively fewer Carbon [13] atoms in their

18  testosterone. Simply put, the theory underlying the test is that if the testosterone

19  metabolites in an athlete's urine sample are more Carbon [13]-depleted than normal,

1   $^{13}$-depleted than normal, that indicates administration of synthetic testosterone.   Ex.

2   1, CAS Decision, ¶¶59-60; Ex. 27, Landis Appeal Brief at 23-30.

3          The CIR test (also referred to as the "IRMS" test) uses a gas-chromatography

4   combustion isotope ratio mass spectrometry (GC/C/IRMS) instrument to measure

5   the Carbon $^{12}$/Carbon $^{13}$ ratio of various compounds in a gas, and in turn compares

6   this ratio to the Carbon $^{12}$/Carbon $^{13}$ ratio in an international standard; the difference

7   between the measured testosterone metabolite value and the international standard

8   is the "delta value."   Ex. 1, CAS Decision at ¶¶59-60.   To account for individual

9   variation caused by diet and other factors, it is also necessary to derive the delta

10  value for what is known as an "endogenous reference compound"–a natural

11  metabolite in the athlete's body   not affected by synthetic testosterone.   The

12  Carbon $^{12}$/Carbon $^{13}$ ratio of that compound is also compared to the international

13  standard, yielding a delta value for the endogenous reference compound.   The

14  difference between the delta for the testosterone metabolite and the delta for the

15  endogenous reference compound is referred to as the "delta delta."   Under the

16  LNDD's interpretation of the WADA CIR positivity criteria, an athlete's sample

17  should be declared positive for the presence of synthetic testosterone if the

18  delta-delta of just one of the four testosterone metabolites is three delta units more

19  negative from the international standard than the delta for the endogenous reference

-68-

1    reference compound.   Because the LNDD's measurement of uncertainty must be

2    applied, samples at that lab are declared positive if the delta-delta is more negative

3    than 3.8 delta units (-3.8). CAS decision at ¶¶59-60.

4         The difficulty arises because the GC/C/IRMS instrument that measures and

5    calculates the isotopic ratios of the chromatographic peaks generated as data <u>cannot</u>

6    <u>also identify the compound represented by this peak</u>.   The GC/C/IRMS

7    chromatograms can tell the analyst what the isotopic values of a peak that elutes at

8    a particular retention time are, but it cannot tell the analyst what compound that

9    peak represents.   Compound identification is accomplished with the other

10   instrument used in the CIR analysis–the gas chromatography/mass spectrometry

11   (GC/MS), which identifies the testosterone metabolites represented by the various

12   peaks, metabolites that elute at different times (retention times) and in different

13   orders . Ex. 1,   CAS Decision, ¶61.   The GC/MS, which also generates data in

14   the form of chromatograms, identifies the testosterone metabolites in a gas by both

15   recording the time it takes the compounds to elute from a column and comparing

16   those to a standard, and also by comparing the molecular fingerprint of the

17   compound; both steps are necessary because different molecules can have the same

18   retention times.   So in the CIR method, two different sets of chromatograms are

19   generated: one from the GC/MS instrument (which identifies the testosterone

-69-

1    metabolites represented by the various peaks), and one from the GC/C/IRMS

2    (which calculates the isotopic values of the peaks of interest).    Ex. 1, CAS

3    Decision at ¶61.    See also Ex. 27, Landis Appeal Brief at 23-30. for a detailed

4    description of the principles of the CIR/IRMS method.

5            The dispute in this case centered around the method LNDD used to link the

6    peaks generated in the GC/MS with the correct peak in the GC/C/IRMS in order to

7    draw the conclusion that a particular testosterone metabolite has a particular Carbon

8    $^{12}$/Carbon $^{13}$ ratio.    It is this step that allows the LNDD to derive the delta-delta,

9    and to conclude that one or more testosterone metabolites is positive for the

10   presence of exogenous testosterone under the lab's positivity criteria.    In order

11   to ensure that the isotopic ratio on a GC/C/IRMS chromatogram is assigned to the

12   correct testosterone metabolite, it is necessary to compare the peaks on the two sets

13   of chromatograms and apply a method for ascertaining which GC/MS peak (which

14   is compound-identified) is associated with which GC/C/IRMS peak (which has a

15   particular isotopic ratio).    This is called peak identification.    And it is this

16   method that LNDD failed to document in a Standard Operating Procedure, in

17   violation of ISL, §5.4.4.3.1, which requires that LNDD "establish criteria for

18   identification of a compound at least as strict as those stated in any relevant

19   Technical Document."    The relevant WADA Technical

1    Document–TD2003IDCR–requires that the Laboratory must establish criteria for

2    identification of a compound, and that it "document appropriate analytical

3    characteristics for a particular assay."   Ex. 37, TD2003IDCR, emphasis added.

4         LNDD staff admitted that the peak identification method used at the lab is

5    *not* documented–not in a a Standard Operating Procedure (SOP), and not in a

6    written validation study .   Ex. 2, Tr. 660:5-661:20, 838:15-22; Ex. 28,   Landis

7    Closing Brief at 11.   Although TD2003IDCR–a standard that the Panel expressly

8    acknowledged, *see* Ex. 1, CAS Decision, ¶¶105-7-- requires documentation of the

9    method used to analyze peaks and there was no dispute that the LNDD's peak

10   identification method was *not* documented, the Panel simply declined to find a

11   violation of the standard, content that the method *"as practiced"* by LNDD was

12   sufficient.   Ex. 1, CAS Decision at ¶105.     The Panel could only have reached

13   this conclusion by refusing to consider pertinent compliance evidence, and by

14   manifestly   disregarding   both   ISL§5.4.4.3.1 and TD2003IDCR. Therefore,

15   vacatur is justified.   9 U.S.C.A. §10(a)(3) and New York Convention, Art. V,

16   §1(b).

17        Not only did the Panel disregard uncontroverted evidence of an ISL violation

18   that should have changed the result in Mr. Landis's case, but it determined that the

19   LNDD "practiced" a method that it had not, in fact, validated.

-71-

1    Because LNDD did not write down how its staff identified peaks in the

2    GC/C/IRMS, Mr. Landis was never able to definitely determine exactly *what*

3    method LNDD had used; he was simply unable to reconcile the statements of the

4    various witnesses describing the lab's peak method.   Ex. 28, Landis Closing Brief

5    at 11-15.   The Panel, however, was evidently satisfied that the LNDD staff had

6    consistently described its unwritten peak identification method, which the Panel

7    explained involved a two-step process.   Ex. 1, CAS Decision, ¶106.   First, the

8    Panel concluded that the lab identified the compounds on the GC/MS

9    chromatograms by comparing the retention times[18] for the sample peaks with the

10   retention times for known standards.   Second, the Panel concluded that LNDD

11   identified the testosterone metabolite peaks in the GC/C/IRMS (which can itself

12   only measure isotopic values) by comparing the retention times for the sample

13   peaks with the GC/C/IRMS retention times for peaks "known" to be the

14   testosterone metabolites in the *blank urine* quality control.   Ex. 1, CAS Decision at

15   ¶106.[19]   The LNDD uses the blank urine sample as both a "negative" quality

16   control   and as an "anchor" for its peak identification method, the theory being

---

[18]   Again, this is the time it takes particular compound to be processed through the instrument and exit the column.

[19]   The blank urine pool was used by LNDD as a "negative quality control" and retention time anchor; it was drawn from one individual known not to be taking any prohibited substances. Ex. 22, USADA's Post-Submission Brief at 20.

1    that if one has definitively identified the testosterone metabolites in the blank urine

2    pool and determined their retention times, one can use that information to identify

3    the compounds in an unknown sample simply by comparing the retention times of

4    the unknown peaks with the retention times in the blank urine.   Ex. 1,   CAS

5    Decision at ¶103.

6       While the WADA Technical Document TD2003IDCR does permit a lab to

7    identify peaks by comparing them to peaks in a "reference collection," the LNDD's

8    blank urine pool did not qualify as a reference collection as defined in the ISL.

9    Reference collections must be comprised of a "collection of samples," not urine

10   from one individual.   Ex. 38, ISL §5.4.6.2; Ex. 28, Landis Closing Brief at 14-5.

11   And as USADA confirmed, the blank urine pool used to identify peaks in Mr.

12   Landis's sample was drawn from *one* individual.   Ex. 22, USADA's Post-Hearing

13   Brief at 20 (blank urine pool drawn from a single volunteer).   A valid reference

14   collection must also be drawn from persons who have been administered "an

15   authentic and verifiable administration of a Prohibited Substance or Method,"

16   which did not happen to the single LNDD volunteer, who was known *not* to have

17   taken any prohibited substance.   *Id.*

18       In order for this blank urine comparison method to work under any

19   circumstances, the peaks in the blank urine pool must be identified in the first place;

1    place; they must be known.    It is undisputed, however, that USADA produced no

2    evidence demonstrating that LNDD *ever   identified the peaks in its blank urine*

3    *pool*.    While USADA did rely upon a document that identified some

4    characteristics of its blank urine pool (Ex. 32, Excerpt, USADA appeal exhibit

5    T026 at   LNDD 309-10), this document contained *other* types of information

6    about the blank urine pool, including date of collection, pH, density, temperature

7    and isotopic values of the compounds of interest.    LNDD 309-310 does *not*

8    demonstrate that LNDD *actually identified* the testosterone metabolite peaks in that

9    blank urine pool, or what their retention times were. Ex. 28,    Landis Closing Brief

10   at 14, ¶(h).    This is not disputed;   USADA's expert, Dr. Brenna, readily

11   admitted that this document does not indicate how LNDD identified the peaks in

12   the blank urine in the first instance.    Ex. 2, Tr. 1083:6-1084:8; Ex. 28, Landis

13   Closing Brief at 14.    Not only does this document fail to establish how LNDD

14   identified the peaks in the blank urine in the first instance, but   LNDD technician,

15   Cynthia Mongongu, testified that *no document* in the documentation package

16   provided to Mr. Landis contained this information; in fact, she did not know if a

17   document containing such information existed at all.    Ex. 2, Tr. 698:6-699:24; Ex.

18   28, Landis Closing Brief at 14.

19       In other words, USADA's own evidence –the only evidence available to the

-74-

1    Panel to support the conclusion that the LNDD's unwritten peak identification

2    method was valid–confirms that LNDD's unwritten method was based upon a

3    comparison between two sets of *unknown peaks*.    Mr. Landis's peaks were not

4    known, but neither were the peaks in the blank urine.    Not one document

5    establishes that LNDD *ever* definitively identified those blank urine peaks in the

6    first instance.    Thus, the linch-pin of the LNDD's unwritten peak identification

7    method as found by the Panel was apparently based on *assumptions*, not a verified

8    and validated method.    Not only is the lab's method not *written*, as required by

9    TD2003IDCR, but even "as practiced," it does not allow one to identify the peaks

10   in a sample.    Mr. Landis clearly presented this argument in his closing brief, but

11   the Panel declined to address it.    Ex. 28,    Landis Closing Brief at 14-15; Ex. 1,

12   CAS Decision at 105-8.

13       ISL §5.4.4.3.1 and WADA Technical Document TD2003IDCR require that

14   peak identification criteria be established, and that the analytical characteristics be

15   *documented* for each sample assay.    The LNDD method was indisputably not

16   documented.    Although the Panel acknowledged that these standards applied,

17   the Panel simply declined to enforce them. Ex. 1, CAS Decision at ¶105-7.    In

18   the face of uncontroverted evidence, the Panel refused to concede that Mr. Landis

19   had established a violation of the ISL, a finding that should have shifted the burden

-75-

1  of to USADA to prove that the violation did not cause the doping violation.   Ex. 1,

2  CAS Decision, ¶32 (athlete rebuts presumption that method was performed in

3  compliance with the ISL by showing a departure).     Further, it was a decision

4  reached only after ignoring the uncontroverted evidence, evidence in the form of

5  admissions by LNDD staff, that the unwritten method LNDD used could not be

6  considered reliable even in "practice" because it was based on an assumption about

7  the peaks in the blank urine pool.   Ignoring evidence is tantamount to a refusal to

8  hear evidence at all, and a denial of Mr. Landis's ability to present his case.

9  Vacatur is therefore proper under FAA, 9 U.S.C.A. §10(a)(3) and New York

10  Convention, Art. V(1)(b).

11      **3.   The Panel ignored USADA's own documentary evidence in**

12           **rejecting Mr. Landis's claim that the LNDD violated the ISL and**

13           **its own SOP by failing to install the proper gas chromatography**

14           **column on its CIR instruments.**

15      No matter what method LNDD used to test Mr. Landis's Stage 17 sample, it

16  was imperative that the two instruments it used to conduct this testing (the GC/MS

17  and the GC/C/IRMS) were functioning properly. At the CAS hearing, however, Mr.

18  Landis established, based upon LNDD's own documents, that the lab had used two

19  *different* gas chromatography columns on its GC/MS and GC/C/IRMS instruments,

-76-

1   which is a violation of the lab's own SOP M-AN-52, constituting an ISL violation.

2   Ex. 39, Excerpt, USADA appeal exhibit T024, USADA 0124 (on July 24, 2006,

3   GC/MS column was an Agilent 19091s-433); Ex. 40, Excerpt, USADA appeal

4   exhibit T025, USADA 303 (on August 4, 2006, GC/MS column was an Agilent

5   19091s-433); Ex. 39, Excerpt, USADA appeal exhibit T024, USADA 0153 (SOP

6   calls for use of an Agilent DB-17ms column); Ex. 40, Excerpt, USADA appeal

7   exhibit T025, USADA 329 (same); Ex. 41, Excerpt, USADA appeal exhibit T084,

8   LNDD 664 (same); Ex. 42, Written Declaration of Cynthia Mongongu at 4 (English

9   Translation)(GC/C/IRMS column used to analyze Mr. Landis's sample was the

10  DB-17ms); Ex. 27, Landis Appeal Brief at 37-41; Ex. 28, Landis Closing Brief at

11  24-26; Ex. 43,   Declaration of Dr. Goodman at ¶¶99-100; Ex. 3, AAA Panel

12  Decision at ¶224 (violation of SOP can constitute violation of ISL).   The use of

13  two different columns can change the order in which testosterone metabolites elute

14  out of the column and are recorded as chromatographic peaks on the CIR data files.

15  Because LNDD relied upon a "peak matching" methodology that involved a visual

16  comparison of the chromatographic   peaks from the GC/MS with the GC/C/IRMS,

17  changing the order in which the testosterone metabolites eluted would have

18  guaranteed that this method would not be accurate.   Ex. 28, Landis Closing Brief

19  at 24, ¶(d); Ex. 27,   Appellant's Appeal Brief at 37; Ex. 43, Declaration of Dr.

-77-

1       Declaration of Dr. Keith Goodman at ¶¶93-97.

2              Faced with another ISL violation confirmed by its own documents, USADA

3       attempted to rebut those documents by proffering the written declaration of one

4       Gerard LePetit, a maintenance contractor employed by LNDD to conduct routine

5       maintenance on its CIR instruments.    According to this declaration,   Mr. LePetit

6       performed a maintenance call on LNDD in April, 2006, removing the correct

7       GC/MS column (the DB-17ms) and installing the Agilent 19091s-433(E) column

8       on LNDD's GC/MS, making a written note of this installation in maintenance

9       report.    Ex.44, Declaration of Gerard LePetit at ¶¶7-12; Ex.45, USADA appeal

10      exhibit T141 at LNDD 1899, 1903.    But while Mr. LePetit declared that it was

11      "probable" that he simply forgot to make a similar notation when he removed the

12      Agilent 19091s-433 at the conclusion of his maintenance call and replaced the

13      DB-17ms, he had no independent recollection of having done so.    Ex. 44,

14      Declaration of Gerard LePetit at ¶13; Ex. 2, Tr. 720:1-21. LNDD technician,

15      Cynthia Mongongu, testified that she accompanied Mr. LePetit on his service call,

16      but added that the LNDD decided to install a *new* DB-17ms at that time.   However,

17      she could not recall watching anyone re-install the DB-17ms column. Ex. 2, Tr.

18      729:7-730:4; Ex. 42, Declaration of C. Mongongu at 4 (English Translation).

19      Claire Frelat, the LNDD technician who was identified in USADA Exhibit T142 as

-78-

1    the technician who installed the new DB-17ms column after Mr. LePetit's service

2    call, made no mention in her two sworn declarations of having made this column

3    change, and further testified that she could not recall having done so.   Ex. 46,

4    Declaration of Claire Frelat; Ex. 47, Rebuttal Declaration of Claire Frelat; Ex. 2,

5    Tr. 818:9-820:6, 820:13-24.

6        Neither Mr. LePetit nor the LNDD technicians had a personal recollection of

7    the facts that would allow them to contradict USADA's documents showing that

8    two different columns were in place when Mr. Landis's samples were analyzed.

9    That being the case, USADA resorted to Exhibit T142 (LNDD 2004-5), a document

10   *not* provided to Mr. Landis in the mandatory Laboratory Documentation Package.

11   LNDD 2005 indicates that a technician with Code Number 26 (Claire Frelat) made

12   a column change on April 27, 2006.   Ex. 48, USADA appeal exhibit T142.   As

13   such, the document appeared to corroborate-- in part-- USADA's claim that the

14   correct column had been re-installed before the lab tested Mr. Landis's samples in

15   July and August, 2006.   However, it also contradicted Mr. LetPetit's claim that he

16   "must have" re-installed the correct column before the conclusion of his service call

17   on April 26 because Exhibit T142 indicates that it was Claire Frelat, Operator 26,

18   who made the column change.       Ex. 48, USADA appeal exhibit T142 at LNDD

19   2005;    Ex.2, Tr. 719:19-720:9.

-79-

1    As stated above, Claire Frelat never alleged that she had made the crucial

2    column change in either of her two sworn declarations, though   Mr. Landis clearly

3    addressed the column issue in his November, 2007 appeal brief.    Ex. 27, Landis

4    Appeal Brief at 38-41.   This is consistent with Ms. Frelat's utter lack of memory

5    about the event.   Ex. 1,   Tr. 818:9-820:6, 820:13-24.    Nor could Ms. Frelat

6    explain why a document she testified had been filled out contemporaneously–as

7    each event occurred–was out of date order, with the January 20, 2006 entry coming

8    *after* the January 30, 2006 entry.   Ex. 48, USADA appeal exhibit T142, LNDD

9    2005; Ex. 2, Tr. 813:8-816:5, 816:18-817:4, 817:23-819:23. What is certain is that

10   if Ms. Frelat changed the column, Mr. LePetit did not, despite his assertions about

11   what he "must have done."    Ex. 2, Tr. 719:19-720:9.

13    Not only is T142 out of date order, it does not identify what type of column

14   might have been installed on April 27, 2006.   Ex. 48, USADA appeal exhibit T142.

15   It does not indicate whether it was a DB-17ms or some other column, though the

16   testimony was that the lab used a number of different columns on its various

17   instruments.   Ex. 2, Tr. 728:20-729:6.   In fact, the document never actually states

18   that a column change occurred;   the French words for "column change"

1    change" ["changement de colonne"]   appear nowhere on the page,[20]   and since

2    Ms. Frelat could not remember the column change,   she could not clarify matters.

3    Ex. 2, Tr. 818:15-820:6.

4         Mr. Young, however, *did* have an explanation–one which contradicted Ms.

5    Frelat's sworn testimony.   In his closing, Mr. Young relied upon LNDD 2005 as

6    proof that the necessary column change had, in fact, occurred.   He assured the

7    Panel that they need draw no conclusion from the fact that the entries on LNDD

8    2005 were not in chronological order, as they should have been if they had truly

9    been filled out contemporaneously; his "commonsense understanding" lead him to

10   believe that the document had either *not* been contemporaneously-completed, as Ms.

11   Frelat testified, or that the dates had been filled in incorrectly at the time.   Ex. 2,

12   Tr. 1471:4-18, 1471:14-24. In other words, Mr. Young urged the Panel to rely upon

13   the dates recorded Exhibit T142/LNDD 2005 to "prove" that the correct column

14   was re-installed before LNDD tested Mr. Landis's sample, but not to draw the

15   conclusion that the document was inauthentic (as   Mr. Landis alleged) because it

16   was not in fact the contemporaneously-created document it was represented to be.

17   Untroubled both by Mr. Young's "heads, I win–tails, you lose" analysis, and   by

18   the fact that Ms. Frelat–who completed the form–declined to testify that she had

---

[20] Inexplicably, the document says that the event occurring on April 27, 2006

-81-

1    testify that she had simply made a mistake even when offered a chance to do so on

2    cross-examination, the Panel embraced Mr. Young's "common sense" explanation,

3    and relied on LNDD 2005 to conclude that the correct column had been re-installed

4    before Mr. Landis's sample was tested.    Ex. 1, CAS Decision at ¶189.

6         Although the Panel relied on LNDD 2005 for the conclusion that a column

7    change occurred in April, 2006, it disregarded the fact that LNDD 2005 indicated

8    that it was Ms. Frelat who made the column change, choosing to believe instead

9    that Mr. LePetit had done it, as he said he "must have."   Ex. 1, CAS Decision at

10   ¶189.    In drawing this conclusion, however, the Panel declined to acknowledge

11   two inconsistencies: 1)    LNDD 2005–which it relied upon for proof of the

12   column change--attributed the column change to Ms. Frelat not Mr. LePetit; and 2)

13   Mr. LePetit could not have made the April 27 column change allegedly evidenced

14   in LNDD 2005 because he finished his work at LNDD on *April 26*. Ex. 48, USADA

15   appeal exhibit T142 at LNDD 2005; Ex. 44, Declaration of Mr. LePetit, ¶7 (Mr.

16   LePetit's service call occurred on April 24-26); Ex. 2, Tr. 785:13-789:6 (column

17   change would have occurred on April 27, after conditioning).

18        Finally, the Panel simply ignored the fact that even accepting LNDD 2005

---

was a   "chat colonne," which translates as "cat column."

1    at face value, it still contained no indication that the *correct* column—the

2    DB-17ms—was installed on April 27, 2006.    LNDD 2005 did not so state, nor did

3    any other witness or document. Ex. 2,    Tr. 720:2-19, 729:7-730:19; 785:13-787:17,

4    813:8-821:20.

5        The Panel simply disregarded these gaps in USADA's evidence. Although

6    not one document or witness witnessed, recalled, or attested to the fact that the

7    DB-17ms column had actually been re-installed on the LNDD's GC/MS instrument

8    before Mr. Landis's sample was analyzed, the Panel simply concluded that LNDD

9    2005 got USADA close enough.    Ex. 1, CAS Decision, ¶189.    In doing so, it

10   disregarded he sworn testimony of USADA's own witness, Claire Frelat, ignored

11   the fact that neither LNDD 2005 nor any other document evidenced the

12   re-installation of a DB-17ms column as required, and completely failed to credit

13.  LNDD's own documents, which clearly indicated that in July and August, 2006, its

14   GC/MS instrument was installed with an Agilent 19091s-433 column, not a

15   DB-17ms column. Ex. 39, Excerpt, USADA appeal exhibit T024, USADA 0124

16   (on July 24, 2006, GC/MS column was an Agilent 19091s-433); Ex. 40, Excerpt,

17   USADA appeal exhibit T025, USADA 303 (on August 4, 2006, GC/MS column

18   was an Agilent 19091s-433); Ex. 39, Excerpt, USADA appeal exhibit T024,

19   USADA 0153 (SOP calls for use of an Agilent DB-17ms column); Ex. 40, Excerpt,

-83-

1   USADA appeal exhibit T025, USADA 329 (same); Ex. 41, Excerpt, USADA

2   appeal exhibit T084, LNDD 664 (same); Ex. 42, Written Declaration of Cynthia

3   Mongongu at 4 (English Translation)(GC/C/IRMS column used to analyze Mr.

4   Landis's sample was the DB-17ms); Ex. 27, Appellant's Appeal Brief at 37-41; Ex.

5   28, Landis Closing Brief at 24-26; Ex. 43,    Declaration of Dr. Goodman at

6   ¶¶99-100.    Unable to reconcile or fill this gap in the chain of events, the Panel

7   simply pretended that it did not exist, denying Mr. Landis was denied a

8   fundamentally fair hearing based upon the evidence, justifying vacatur.   9 U.S.C.A.

9   §10(a)(3); New York Convention, Art. V §(1)(B).   Not only did the Panel ignore

10   the significance of USADA's own documents, its reliance upon the word of Mr.

11   Young to contradict the sworn testimony of USADA's own witness is suggestive of

12   an actual bias favoring their fellow CAS arbitrator, justifying vacatur under 9

13   U.S.C.A. §10(a)(2).

14        **4.    The CAS Panel refused to consider Mr. Landis's evidence**

15             **establishing that the LNDD's CIR instrument had not been**

16             **maintained as required by the ISL and the lab's own Standard**

17             **Operating Procedures**

18        Not only did Mr. Landis establish that LNDD failed to install the correct

19   column on its CIR instruments, he established that the LNDD had failed to ensure

-84-

1    that the CIR instrument was functioning in a linear fashion, which is necessary to

2    accurate measurement.     The lab's Standard Operating Procedure ("SOP")

3    required that it perform monthly linearity checks on its GC/C/IRMS instrument, but

4    as the AAA Panel concluded, it failed to do so, neglecting to perform such a test in

5    August, 2006. Ex. 3, AAA Panel Decision at ¶¶217-219.     The lab's failure to

6    conduct monthly linearity checks of its CIR instrument was a violation of the ISL

7    and the LNDD's    own Standard Operating Procedure (SOP).     Ex. 3, AAA Panel

8    Decision at ¶¶217-219; Ex. 27, Appellant's Brief at 49-50; Ex. 28, Landis Closing

9    Brief at 19-20.

10   Linearity is of crucial importance in this case because only those CIR

11   instruments operating in a linear fashion are able to provide accurate measurements.

12   Ex. 3, AAA Panel Decision, ¶214, ¶216; Ex. 49, Declaration of Dr. Simon Davis,

13   ¶52; Ex. 28, Landis Closing Brief at 9, ¶(E)(2).     Therefore, labs must perform

14   instrument tests on a routine basis in order to maintain WADA accreditation and

15   ensure quality control.   Ex. 3,    AAA Panel Decision at ¶214.    The AAA Panel

16   had concluded that the LNDD failed to conduct a linearity test in August 2006,

17   breaching its own SOP and the ISL.    *Id.* at ¶¶217-9; Ex. 50, USADA appeal

18   exhibit T112 at   LNDD 547 (§4.2.6.2 of SOP 1-N-29).    However, declining to

19   shift the burden of proof to USADA to *prove* that this failure did not cause the

1    Adverse Analytical Finding (as required by WADA Code, Art. 3.2), the AAA Panel

2    simply concluded that because at least one of the linearity checks that LNDD *did*

3    perform occurred within one month of the testing of Mr. Landis's sample (the June

4    26 and July 31 tests), the failure to perform checks on a monthly basis could not

5    have caused the doping violation.   *Id.* at ¶¶218-9.

6        Since the CAS appeal was a *de novo* hearing, USADA again faced the burden

7    of proving that the failure to conduct the August 2006 linearity did not cause the

8    doping violation, a burden that it had to assume given that LNDD had violated the

9    ISL in failing to conduct the monthly checks.   Ex. 29, WADA Code, Art. 3.2.

10   Apparently not confident that the CAS Panel would follow the AAA Panel's lead

11   by relieving it of the burden of actually *proving* that the failure to conduct an

12   August 2006 linearity test did not cause the doping violation, USADA "found" a

13   document to "cure" the underlying violation, a document it asserted was the August

14   2006 linearity test.   That document, Exhibit T155, was tendered to establish that

15   LNDD had *not* violated the ISL because it had, in fact, conducted monthly linearity

16   tests.

17       Exhibit T155 was located at a fortuitous time for USADA, occurring only a

18   few   weeks before the CAS Panel hearing, but more than one month after the CAS

19   Rule R56 deadline for identifying exhibits had passed.   Ex. 51, Letter from

-86-

1    Richard Young to Matthieu Reeb, February 27, 2008 and attached Exhibit T155,

2    LNDD 2018-2022; Ex. 4, CAS Rule R56. Worse, it was produced a *year* after

3    LNDD asserted that "there were no other linearity tests done in between those

4    already produced," and more than a year after the AAA Panel warned USADA that

5    it would be precluded from introducing into evidence any documents requested in

6    discovery but not produced, documents like this August, 2006, linearity check.

7    Ex. 52, Respondent's Motion to Strike Untimely Exhibits and Related Testimony at

8    2, and Exhibit 4 to that Motion, at page 11 [March 30, 2007 letter from Richard

9    Young to the AAA Panel](LNDD had no more linearity document); Ex. 3 , AAA

10   Panel, Procedural Order No. 2, March 15, 2007, ¶5 (documents not produced in

11   discovery could not be relied upon); Ex. 28, Landis Closing Brief, 19-20, 33.

12        Given the suspicious circumstances, Mr. Landis strenuously objected to

13   admission of the test. Untroubled by the fact that T155 should have been produced

14   a year earlier, or by the fact that USADA presented the document only weeks

15   before the CAS Panel hearing, and more than one month after the Rule R56

16   deadline for identifying exhibits had passed, the Panel admitted the document.   Ex.

17   51, Letter from Richard Young to Matthieu Reeb, February 27, 2008 and attached

18   Exhibit T155, LNDD 2018-2022; Ex. 52,   Respondent's Motion to Strike

19   Untimely Exhibits and Related Testimony at 2; Ex. 2,   Tr. 798:2-799:7,

-87-

1    800:4-801:8. The Panel ultimately concluded that this August 2006 linearity

2    document cured the violation identified by the AAA Panel.   Ex. 1,   CAS

3    Decision, ¶91.        Not only should the document have been excluded if the Panel

4    were proceeding in an even-handed manner with respect to its application of CAS

5    Rule R56, but it should have been excluded because it was not authentic, as Mr.

6    Landis alleged.   Ex. 28, Landis Closing Brief at 33-34.·  He advanced at least

7    three separate factual grounds for that allegation.      Lacking evidence with which

8    to counter these fact-based challenges to the document's authenticity, the Panel

9    simply ignored them, stating flatly that Mr. Landis had   "adduced" no evidence to

10   counter the LNDD technician's testimony that she was "satisfied" that the

11   document was, in fact, the original and unaltered August 2006 linearity check.   Ex.

12   1,   CAS Decision, ¶92.

13          The record is to the contrary.   It confirms that Mr. Landis identified

14   significant differences between the timely-produced linearity tests conducted on

15   June 26, 2006, July 31, 2006 and September 25, 2006 (Ex. 32, Excerpt, USADA

16   appeal exhibit T026 at   LNDD 313-320, LNDD 327-29) and the late-produced

17   document represented to be the August 2006 linearity check. Ex. 51, USADA

18   appeal exhibit T155.

19          First, the Data Processing Results for the timely-produced linearity tests

1    reveal that the name of the "Folder" on each test document is the date on which the

2    test was performed; that date is also entered on the line of the results sheet marked

3    "Batch Name."   Ex. 32, Excerpt, USADA appeal exhibit T026 at LNDD 313, 315,

4    317, 320, 322, 324, 327, 329, and 331.   So, for example, the June linearity test has

5    a "Folder" name of 260606 (June 26, 2006).   *Id.* at LNDD 313.   By contrast, the

6    newly-located Data Processing Results sheet contained in Exhibit T155 does not

7    contain a date in the Folder or Batch Name lines, but instead states the word "STAB

8    3."   Ex. 51, Exhibit T155, LNDD 2020-2022.   In order for USADA's claim that

9    the August 2006 linearity document was authentic to be plausible, one has to accept

10   that LNDD adopted a different folder- and batch-naming procedure just for the

11   month of August, returning to its practice of using the date as the folder and batch

12   name in September 2006.   This is not credible.

13        Second, Mr. Landis pointed out that the graphic presentation of the linearity

14   run produced for the August 2006 "test" is not like the graphic presentations of the

15   linearity runs occurring on June 26, July 31, or September 25, 2006. Ex. 52,

16   Respondent's Motion to Strike Untimely Exhibits and Related Testimony at 12.

17   The graphic presentation of the data on Exhibit T155/LNDD 2019, displays data on

18   a graph, the x axis of which is measured in "AV" units, 3540-3595, and the y axis is

19   measured in Amps, 4.00E-3 to 4.60E-3.   Ex. 51, USADA appeal exhibit

-89-

1   T155( LNDD 2020-2022).     None of the earlier linearity runs have "AV" on the x

2   axis and none use the same Amp scale for the y axis.    Ex. 32, Excerpt, USADA

3   appeal exhibit T026 at LNDD 319 and 326; LNDD 314, 316, 318, 321, 323, 325,

4   328, 330 and 332.

5        Third, Mr. Landis noted that when LNDD provided him with access to the

6   LNDD's Electronic Data Files just prior to the AAA hearing, he was also provided

7   with a complete file directory listing containing all files and directories for the CIR

8   instrument over the relevant period of time.    The folder with the name "STAB 3"

9   *was not listed* among those file and folder names.    Ex. 28, Landis Closing Brief at

10  33-34; Ex. 53, Landis Exhibit GDC 871-908.

11       USADA attempted to rely upon LNDD technician, Claire Frelat, to

12  "authenticate" Exhibit T155, but her testimony was confused. For example, Ms.

13  Frelat had submitted a witness declaration indicating that one of the "LNDD staff"

14  had located thisAugust 2006 linearity document, but on the stand at the CAS appeal,

15  she admitted that *she* was the member of the   "LNDD staff" that had located the

16  August linearity document.    When asked why she didn't clearly state this in her

17  declarations, she said that it was simply "shorter" to write that "LNDD staff" found

18  the document than it was to write "I" found the document.    Ex. 28, Landis Closing

19  Brief at 34, ¶(v)( C); Ex. 2, Tr. 918:14-920:4.    Ms. Frelat's memory about the

-90-

1   memory about the details surrounding her location of that document was sketchy,

2   Ex. 2, Tr. 881:20-884:24, though she was ultimately "satisfied" that it was authentic.

3   Ex. 2,   Tr. 920:5-9.

4          The Panel simply disregarded Mr. Landis's evidence that the document

5   lacked the necessary indicia of authenticity.   In so doing, it did not *weigh* that

6   evidence, it proceeded as if no evidence had been presented, or "adduced," at all.

7   Ex. 1, CAS Decision at ¶92. Pretending that no evidence was "adduced" to support

8   the allegation of falsity is tantamount to a refusal to hear evidence at all, justifying

9   vacatur under FAA, 9 U.S.C.A. §10(a)(3) and the New York Convention, Art.

10   V(1)(b).

11   **5.    The Panel disregarded both the law and the facts in concluding**

12   **that LNDD's chain of custody was complete**

13          During the CAS appeal hearing, Mr. Landis established that the chain of

14   custody documents produced to him by LNDD revealed nine separate gaps in the

15   chain of custody for Mr. Landis's Stage 17 sample, a violation of the ISL, ¶3.2,

16   ¶5.2.2 and of WADA technical document, TD2003LCOC.   Ex. 28, Landis

17   Closing Brief at 26-27; Ex. 27, Appellant's Brief Submitted by Floyd Landis at

18   68-73.    Implicitly acknowledging that Mr. Landis had demonstrated a departure

19   from the ISL—a fact that should have shifted the burden to USADA to prove (with

1    evidence) that the departure did not cause the doping violation–the panel declined

2    to credit this evidence. Instead, at the urging of fellow CAS arbitrator, Richard

3    Young, the Panel ruled for the first time in CAS history that literal compliance with

4    the ISL was no longer required so long as compliance with the "concepts" of the

5    rules would be sufficient.    Ex. 1, CAS Decision, ¶178.    Given this ruling, the

6    Panel found it unnecessary to weigh Mr. Landis's evidence establishing that literal

7    compliance with the chain of custody rules had not, in fact, occurred.    In so

8    doing, the Panel both declined to consider Mr. Landis's evidence, making vacatur

9    appropriate under FAA §10(a)(3), and manifestly disregarded the applicable law.

10    The CAS panel's decision is contrary to the well-established rules governing

11    the conduct of WADA laboratories, rules that are set forth in the International

12    Standard for Laboratories ("ISL") and WADA technical documents. Under the

13    World Anti-Doping Code, lab compliance with the ISL is mandatory.    Ex. 38,

14    ISL (Preamble) at 2.    As expressly recognized by the panel in its decision [*see*

15    Ex. 1, CAS Decision at ¶¶163-4],    both the ISL and TD2003LCOC emphasize that

16    the key requirement of the laboratory's chain of custody is that it consist of

17    documentation "of the sequence of persons in possession of the sample and any

18    portions of the sample taken for testing." Ex. 38, ISL, ¶3.2 ("Laboratory Internal

19    Chain of Custody" defined as documentation); ISL ¶5.2.2.2 (lab required to

1    maintain a Laboratory Internal Chain of Custody to control and account for samples

2    from receipt through final disposition); Ex. TD2003LCOC (a chain of custody is

3    documentation).    TD2003LCOC elaborates on ISL §5.2.2.2 by detailing the sorts

4    of information that should be included on the chain of custody documentation, and

5    clarifying that   transfers of any sample should be noted on the chain of custody

6    documentation when they occur, and not later.   Ex. 54 , TD2003LCOC.    Only a

7    contemporaneous written record generates chain of custody data of evidentiary

8    quality, an express purpose of the ISL itself.   See Ex. 38, ISL, ¶1.0, Ex.3, AAA

9    Panel decision, ¶154.

10         USADA never introduced documentary evidence closing the particular chain

11    of custody gaps Mr. Landis identified.   Ex. 22,   USADA Post-Hearing

12    Submission Brief at 37-41. In fact, the only   *document* cited by USADA to support

13    its half-hearted claim that the available documentation made it possible to "follow

14    LNDD's bottle chain of custody" for Mr. Landis's particular sample was Exhibit

15    T144.   Far from being a lab-created chain of custody document created at the time

16    sample transfers were made, Exhibit T144 was    attorney work-product prepared in

17    January 2008 for USADA's lawyers by consultant, Dr. Hatton, just prior to the time

18    that USADA filed its response Mr. Landis's CAS appeal.   Ex. 22, USADA

19    Post-submission brief at 39 (citing Exhibit 144); Ex. 55, USADA appeal exhibit

-93-

1   exhibit T144 (marked as "Privileged and Confidential. Attorney Work-Product.

2   LandisLabMap&COCHatton30Jan08.doc"].   In other words, USADA was

3   unable   to produce documentation showing a complete and continuous chain of

4   custody for Mr. Landis's sample, as required by the ISL and WADA technical

5   documents.

6        Implicitly acknowledging that Mr. Landis had successfully demonstrated a

7   departure from the ISL rule that chain of custody be completely documented, the

8   panel simply concluded that literal compliance with the ISL was no longer required,

9   despite the WADA Code's clear admonition that compliance with the ISL is

10   mandatory.   Ex. 38, ISL at 2, ISL ¶3.2, ¶5.2.2.2.   In order to avoid the clear and

11   express language of these WADA rules, the CAS panel accepted the unsupported

12   statement of fellow CAS arbitrator, Richard Young, who contended that the clear

13   requirement for documentation could be disregarded for two reasons– 1)   LNDD

14   was only required to comply with the "concepts" of the chain of custody rules, and

15   2) a chain of custody could be created by *post hoc* testimony, despite the express

16   requirement of "documentation." Ex. 1, CAS decision, ¶¶ 175, 178.

17        The Panel decision is irreconcilable with the express and unequivocal

18   language of the rules themselves.   The Panel was well aware of those rules

19   because they acknowledged and correctly quoted them at ¶¶163-164 of its decision.

1    The rules were clear and explicit.   As the dissenting arbitrator on the AAA Panel

2    below observed, "the fight against doping is arduous and it may require strict rules.

3    But the rule-makers and rule-appliers must begin by being strict with themselves."

4    Ex. 19, AAA Dissent at 5, note 21, quoting *Quigley v. USA Shooting,* CAS 94/129

5    [Jan Paulsson, Panel President/Richard Young representing USA Shooting, *see* Ex.

6    10).   Although the panel was clearly aware of the rules and their clear meaning, it

7    disregarded those rules.   Thus, the panel's decision was one made in manifest

8    disregard of the law.

9         The panel also acted with manifest disregard for the law when it accepted Mr.

10    Young's contention that a chain of custody may be established by testimony

11    because this conclusion, too, is contrary to the ISL's express requirement for

12    documentation.   As the Panel clearly recognized, the ISL defines a chain of

13    custody as "documentation."   See Ex. 1, CAS Decision at ¶163 (quoting the ISL's

14    definition of "Laboratory Internal Chain of Custody,"  ¶3.2).   ISL ¶5.2.2.2

15    incorporates this defined term (requiring documentation) into its directive that labs

16    maintain chain of custody procedures.   And WADA technical document

17    TD2003LCOC expressly reiterates the emphasis on documentation in its first

18    sentence: "The Laboratory Internal Chain of Custody is documentation....".   Ex. 1,

19    CAS Decision at ¶164, quoting TD2003LCOC.   The fact that TD2003LCOC

1  allows a lab technician named on the chain of custody documents to explain entries

2  made on those documents does not extinguish the requirement for documentation in

3  the first instance; to accept this interpretation would completely undermine the

4  rule's express documentation requirement, and would contradict the purpose of a

5  chain of custody, which is to eliminate the need to rely upon fuzzy memories of

6  long-past sampling events.   Instead, a technician named on a document may

7  explain his or her participation in the sampling activities noted on the document.

8  The requirement for documentation is clear, explicit and well-established.

9       The reliability problems that arise when a lab looks to *post hoc* testimony to

10  explain who did what with a lab sample analyzed months earlier are aptly illustrated

11  by the "one specific instance of improper chain of custody...of particular note"

12  referenced in the Panel decision. This gap of "particular note" centered around the

13  very first set of tests performed on Mr. Landis's "A" sample on July 21, 2006.

14  The documents recording the transfers made on the morning of July 21–LNDD

15  1590 and 1591–provide conflicting accounts of the location or person from which

16  the first operator obtained Mr. Landis's sample that morning, the time at which this

17  transfer was made, and the identity of all persons handling his sample that morning.

18  Ex. 56, USADA appeal exhibit T103 at LNDD 1590-91.    Specifically, LNDD

19  1590 states that Operator 44 (Laurent Martin) had possession of Mr. Landis's

-96-

1    of Mr. Landis's sample at 7:25 a.m. in Room 107, but it does not state where Mr.

2    Martin got that sample.   It also states that Operator 44   transferred the sample to

3    Room 006 at 9:00 a.m., but does not identify the person receiving the sample.   By

4    contrast, LNDD 1591 indicates that the sample was retrieved from a refrigerator

5    CHFR-1, but at a different time--7:30,   not 7:25.   It also states that it was

6    Operator 42 (Jean Antoine Martin) not Operator 44 (Laurent Martin) who

7    transferred the sample from Room 107 to Room 006 at 9:00 a.m. that morning.

8    Because they are in conflict, these two documents cannot establish a clear and

9    continuous record of the persons in possession of Mr. Landis's sample on the

10   morning of July 21, the location of that sample,   or the time at which transfers of

11   the sample occurred, as required by ISL ¶5.2.2.2 and TD2003LCOC.

12         USADA had no other contemporaneously-recorded documentary evidence to

13   close the gaps in the July 21 chain of custody, so it submitted written testimony

14   from Operators 44 (Laurent Martin) and 19 (Myriam Garcia) instead. These were

15   two of the LNDD technicians who had handled Mr. Landis's "A" sample bottle that

16   day.   Even assuming, *arguedo*, that the ISL allows for the creation of a chain of

17   custody with testimony–which it does not--the declarations of Garcia and Martin

18   did not resolve the inconsistency between LNDD 1590 and LNDD 1591.

19         In his written declaration, Mr. Martin confirmed that the information on

-97-

1    LNDD 1590 was correct–he obtained Mr. Landis's A sample bottle at 7:25 a.m. on

2    July 21, 2006–but he added that he retrieved the sample from the CHFR-1

3    refrigerator, a transfer of the sample that should have been recorded on LNDD 1590,

4    but was not. Ex. 57, Declaration of L. Martin.    Finally,    Mr. Laurent declared that

5    LNDD 1591 "shows that I transferred it to Garcia (operator code 19)."    *Id.* at 4.

6    This, of course, is incorrect; LNDD 1591 says nothing about Mr. Laurent Martin

7    because his operator number (44) appears nowhere on that document.    Nor did Mr.

8    Martin have an independent recollection of giving the sample to Ms. Garcia.    Ex. 2,

9    Tr. 725:16-726:12.

10    Ms. Garcia's declaration also failed to resolve the discrepancy between

11    LNDD 1590 and LNDD 1591.    In her original declaration, Ms. Garcia never

12    indicated who actually completed LNDD 1591, never explained why LNDD 1591

13    and LNDD 1590 are inconsistent as to the time at which the first possession of Mr.

14    Landis's sample occurred on July 21 (7:25 a.m. or 7:30 a.m.), and never explained

15    why Operator 42 had the sample on July 21, as indicated on LNDD 1591, or who

16    he got it from.    Ex. 58, Declaration of Myriam Garcia.

17    However, her story changed in a rebuttal statement filed ten days later.

18    Ex.59, Rebuttal Declaration of Myriam Garcia.    In that rebuttal, Ms. Garcia

19    declared for the first time that she was the person that completed LNDD 1591, and

1  that she had made "two mistakes" when doing so--incorrectly noting the time that

2  the sample was removed from storage as 7:30 instead of 7:25, and incorrectly

3  identifying Operator 42 as the person transferring the bottle to Room 006, when she

4  should have identified Operator 44.   In short, Ms. Garcia's rebuttal declaration

5  neatly resolved the inconsistencies between LNDD 1590 and LNDD 1591.   The

6  trouble is that when Ms. Garcia was examined by USADA's own lawyer on direct

7  examination, she denied having written the second declaration:

8
9      Q:    Ms. Garcia, you've submitted two statements in this proceeding,
10           correct?

11     A:    **No, only one statement.**
12
13     Q:    I think the record reflects that there are two statements, one dated
14           March 5 and one dated March 12.   Do you have both of those with
15           you, Ms. Garcia?
16
17     A:    Yes, I have one statement in front of me.
18
19     Q:    What is the date on that statement?
20
21     A:    It's the fifth of March.
22
23     Q:    Ms. Garcia, we have a record before us that is a second declaration that
24           you filed dated March 12th, and I'm not sure why you don't have it in
25           front of you, but we have it here.
26
27     A:    Okay, fine.
28
29     Q:    So Ms. Garcia, just so we're clear here, do you recall now that there
30           were two separate statements you filed, one on March 5 and another on
31           March 12th?

1

2          A:      **No, I don't remember.**

3

4     Ex. 2, Tr. 1241:4-1242:5; emphasis added.   It was only after Mr. Paulsson read

5     virtually all of the March 12 rebuttal to her in French[21] and asked her if it was

6     "reminding her of anything," that Ms. Garcia indicated that she remembered

7     signing a statement containing such recitations.   Ex. 2, Tr. 1247:4-1249:2.

8          Having "admitted" that she "recalled" writing a statement containing the

9     factual allegations from the rebuttal declaration that Mr. Paulsson had just finished

10    reading to her, Ms. Garcia went on to testify that she in fact *had* no independent

11    recollection of the facts stated in that declaration; "two years was too long" ago for

12    her to remember the facts of July 21, 2006.   Ex. 2, Tr. 1249:20-1256:25, esp.

13    1251:7-8, 1241:18-20, and 1252:2-5.      She further admitted that the sole basis

14    for her conclusion that she had made a "mistake" in recording the time and operator

15    code when completing LNDD 1591 two years earlier was the fact that LNDD 1590

16    said something different; she had no independent recollection of these facts. Ex. 2,

17    Tr. 1254:21-1255:15, Tr. 1256:8-25.   Setting aside the troubling question of how

18    the rebuttal declaration came to include those factual allegations she had no

---

[21]   The transcript does not include any of French questions and answers, only the English translation.   Because Mr. Paulsson read Ms. Garcia's alleged March 12 rebuttal to her entirely in French, this reading is not reflected in the transcript. Ex. 2, Tr. 1247:23-1248:16.

1    she had no memory of, the one thing that *is* clear from Ms. Garcia's testimony is

2    that the information she recorded on LNDD 1591–that Operator 42 removed the

3    bottle from storage at 7:30–was based on her "personal direct observation at the

4    time two years ago," and was therefore the best evidence she could offer about the

5    events of July 21, 2006.     Ex. 2, Tr. 1256:8-25.   Ms. Garcia had no memory of

6    the facts stated in the rebuttal declaration and no memory that she made a

7    "mistake" two years earlier when completing LNDD 1591.   She was simply not

8    competent to testify that she had made a mistake on July 21, 2006.

9         The Panel was undeterred by Ms. Garcia's lack of memory.   Ignoring her

10   repeated insistence that she had no independent recollection of the events of July 21,

11   the Panel instead insisted that it would rely upon her rebuttal declaration because

12   she"appeared to be clear about the details of the actual testing" on July 21 Ex. 1,

13   CAS Decision at ¶178.   Of course, it was not "testing" that was at issue, it was the

14   movement of Mr. Landis's sample.   And Ms. Garcia's sworn testimony was that

15   she had no independent recollection of those facts but depended entirely on the

16   documents.     In reaching its conclusion that Mr. Landis's evidence was

17   insufficient to establish a breach in the chain of custody, the Panel both disregarded

18   existing evidence and created non-existent evidence, justifying vacatur under 9

19   U.S.C.A §10(a)(3) and New York Convention, Art. V, §1(b).

-101-

1          Paragraph 179 of the Panel Decision suggests that the Panel must have

2     realized the shaky legal and factual ground upon which its opinion rested because

3     there, the Panel holds that even if Mr. Landis had successfully demonstrated that

4     there were "imperfections in the bottle chain of custody such as to constitute an ISL

5     violation," he still would not have prevailed because he failed to prove that the

6     LNDD staff tampered with that sample.    Ex. 1, CAS Decision, ¶179.    This, of

7     course, is not his burden, and represents an assignment of the burden of proof not

8     permitted under the Code, which never imposes upon the athlete the burden of

9     proving that an ISL violation actually caused the Adverse Analytical Finding.    To

10    the contrary–if the athlete proves that a violation of the ISL occurred, the burden

11    shifts to the anti-doping agency to prove that the ISL violation did not cause the

12    Adverse Analytical Finding.    Ex. 29, WADA Code, Art. 3.2.1, 3.2.2.    This is

13    boilerplate law in the anti-doping context; indeed, the Panel expressly (and

14    correctly) recited these rules in Paragraphs 32 and 33 of its opinion.    Ex. 1,    CAS

15    Decision, ¶¶32-33; see also ¶¶28-29 (correctly describing USADA's standard of

16    proof).    These rules are clear and explicit, they have been in place for years, and

17    have been applied by each of these arbitrators on numerous occasions in the past.

18    Nevertheless, this Panel disregarded those rules in reaching the conclusion that

19    even if Mr. Landis had successfully established that the LNDD violated the ISL, his

1    ISL, his claim could not succeed because he did not also prove that the LNDD staff

2    itself had tampered with the sample.    This decision was made in manifest

3    disregard of the law.

4

5        E.    CONCLUSION

6            Mr. Landis was entitled to a fundamentally fair hearing, a hearing in which

7    he was provided notice of the issues to be decided, and a decision based on the

8    evidence, made by impartial arbitrators.    He received none of this.

9            The CAS system cannot provide an impartial forum because CAS refuses to

10   prohibit its arbitrators from continuing to represent clients before CAS panels,

11   institutionalizing the worst form of the "repeat player" bias.    In Mr. Landis's case,

12   each of his arbitrators either actively represented clients before the CAS, was a

13   member of a firm that solicited sports clients, or had appeared before the CAS on

14   behalf of one or more litigants in the past.    His opponent, USADA, had retained

15   another CAS arbitrator to represent it in this case, a lawyer/arbitrator who had

16   repeatedly been appointed to CAS panels before which one of the Landis arbitrators

17   had appeared as an advocate, a circumstance that could occur again at any time.

18   These facts were never disclosed to Mr. Landis. In such a situation, the incentive to

19   embrace positions favorable to the CAS arbitrator's client, USADA,    is simply too

-103-

1    USADA, is simply too powerful to provide a clearly impartial arbitral forum free

2    of potential bias.

3         In Mr. Landis's case, evidence of that bias is suggested by the $100,000

4    cost award imposed against him, an award not contemplated by UCI rules and one

5    based not on the evidence, but upon post-hearing statements presented by

6    USADA's CAS arbitrator/lawyer in a brief to which Mr. Landis was denied the

7    right of reply. This $100,000 award was but one of the many decisions that were

8    contradicted by the evidence, incompatible with the applicable law, or both, and but

9    one of the instances in which the hearing procedure adopted by the Panel denied Mr.

10   Landis an opportunity to present his case. Because arbitrators have free rein to

11   decide both questions of law and fact, their impartiality must be scupulously

12   safeguarded. The CAS system simply does not provide such safeguards.


14        Mr. Landis was entitled to a hearing that provided basic due process, but he

15   did not receive it. He respectfully requests that his motion to vacate the CAS

16   Panel's arbitral award be vacated.

17

18   **III.   PRAYER FOR RELIEF**

19        The CAS arbitration system institutionalizes and exacerbates the "repeat

-104-

1    player" bias, denying athletes like Mr. Landis even a chance at an impartial panel.

2    That bias is particularly acute in Mr. Landis's case because one of the arbitrators

3    continues to represent a client before the CAS, and has a strong incentive to not

4    only embrace positions favorable to that client (the International Olympic

5    Committee), but also to defer to USADA, which is represented in this case by a

6    lawyer who also serves as a CAS arbitrator, one who has sat in judgment of the

7    Landis-selected arbitrator on several previous cases, and can expect to do so again.

8         WHEREFORE, for the reasons stated above, Mr. Landis respectfully

9    requests that this Court exercise the authority granted under the Federal Arbitration

10   Act, 9 U.S.C.A. §10(a)(2)-(4), federal common law and/or the New York

11   Convention, Art. V, and:

12        1)    VACATE the arbitral award entered in the arbitral proceeding known

13              as *Floyd Landis v/USADA*, CAS 2007/A/1394 dated June 30, 2008;

14        2)    VACATE the $100,000 cost award issued by the Panel in *Floyd*

15              *Landis v/USADA*, CAS 2007/A/1394;

16        3)    VACATE the order of suspension confirmed by the Panel in *Floyd*

17              *Landis v/USADA*, CAS 2007/A/1394;

18

19        4) GRANT such other relief as it considers just and proper under the

1        circumstances.

2

3

4        DEMAND FOR JURY TRIAL

5

6

7                   Respectfully submitted,

1
2
3
4
5    Attorneys of Record for: Floyd Landis
6
7
8
9    Dated: September 23, 2008
10
11                                    Roger G. Worthington, Esq. (202147)
12                                    Law Office of Roger G. Worthington,
13                                    P.C.
                                      273 W. 7th Street
14                                    San Pedro, California 90731
15                                    Telephone: (310) 221-8090
                                      Facsimile: (310) 221-8095
16                                    rworthington@rgwpc.com
17
18
19
20
21
                                      Kay Gunderson Reeves, Esq.
22                                    (08620470)
23                                    6815 Lakeshore Dr.
                                      Dallas, TX 75214
24                                    Telephone: (214) 824-7871
25                                    Facsimile: (214) 824-8677
                                      kaygreeves@yahoo.com
26
27
28